528 A.2d 210

**COMMONWEALTH of Pennsylvania**

v.

**Michael ATKINSON, Appellant.**

Superior Court of Pennsylvania.

Argued March 17, 1987.

Filed June 23, 1987.

S. Sanford Kantz, New Castle, for appellant.

Angelo A. Papa, Assistant District Attorney, New Castle, for Com., appellee.

Before ROWLEY, DEL SOLE and TAMILIA, JJ.

DEL SOLE, Judge:

For our consideration is an appeal from the judgment of sentence entered following Appellant's conviction for the first degree murder of Kathy Kadunce and the third degree murder of her daughter, Dawn Kadunce. Appellant was sentenced to life imprisonment for the first degree murder conviction. For the third degree murder conviction Appellant received 10 to 20 years of incarceration to run consecutive to the first degree murder sentence. This timely appeal ensued.

By his brief, Appellant raises seven instances of error allegedly committed at the trial court level. They are:

1. Where appellant is arrested outside of the jurisdiction of the arresting officers, which officers are not in "hot pursuit", is such an arrest illegal, thus necessitating the suppression of all statements and confessions taken as a result?

2. Where appellant is arrested and gives statements of confessions more than six (6) hours after said arrest and is not arraigned until approximately twenty-five (25) hours after said arrest, should said statements or confessions be suppressed?

3. Where statements are taken subsequent to an arraignment which was unnecessarily delayed, and such statements are clarifications of previous statements given prior to arraignment in violation of *Davenport*, must said statements be suppressed?

4. Where the Appellee causes delays in bringing Appellant to trial and petitions for an extension of time but fails to show due diligence, did the court below err in granting said petition and denying Appellant's petition to dismiss under Pa.R.Crim.P. 1100?

5. Did the court below err in not granting the appellant a change of venue?

6. Where during the course of the trial a spectator, in full view of the jury, attempted to influence their decision by making several thumbs down motions, did the court below err in not granting Appellant's motion for a mistrial?

7. Where appellant was convicted in October 6, 1980, and more than five (5) years elapsed before he was sentenced on April 15, 1986, to life imprisonment, was the appellant denied his right to a speedy trial in violation of the sixth amendment?

## I.

Initially, we find that absent from Appellant's post-verdict motions is the assignment of error advanced in Appellant's first issue, *supra*. It is well-established that only issues included in post-verdict motions are preserved for appeal. *Commonwealth v. Mason*, 327 Pa.Super. 520, 476 A.2d 389, 396 (1984). *See Commonwealth v. Pierce*, 272 Pa.Super. 392, 416 A.2d 97, 99 (1979). Accordingly, Appellant has failed to preserve this issue for appellate review.

## II.

Appellant contends that certain oral and written statements given by him should have been suppressed since they were the products of unnecessary prearraignment delay in violation of *Commonwealth v. Davenport*, 471 Pa. 278, 370 A.2d 301 (1977). In that bellwether decision, our supreme court ruled that all statements made by an accused after arrest, but before arraignment, are inadmissible when arraignment is not held within six hours of arrest. *Id.* at 471 Pa. at 286, 370 A.2d at 306. *See* Pa.R.Crim.P. 123 (setting forth prearraignment procedure where warrant of arrest is executed outside judicial district of issuance). *See also Commonwealth v. Feighery*, 354 Pa.Super. 1, 510 A.2d 1248 (1986) (*Davenport* six-hour rule expressly held applicable to Rule 123).

Appellant argues that the *Davenport* mandate was violated insofar as 25 hours elapsed between the time of his arrest and subsequent arraignment. For purposes of a *Davenport* analysis, we must first establish at what point Appellant was arrested. An arrest constitutes "any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest". *Commonwealth v. Woodson*, 342 Pa. Super. 392, 493 A.2d 78 (1985), quoting *Commonwealth v. Lovette*, 498 Pa. 665, 671, 450 A.2d 975, 978 (1982). Instantly, Appellant had already been incarcerated for a different offense at the time the warrant for his arrest on the Kadunce murders was issued. Given the fact that Appellant was already restricted, we must evaluate all of the surrounding circumstances in order to set the exact time of arrest. *Commonwealth v. Crissy*, 304 Pa.Super. 38, 42, 450 A.2d 89, 91 (1982). "Whether an arrest had occurred depends upon the impression conveyed to the person detained, not upon the officers' subjective intention." *Commonwealth v. McManus*, 353 Pa.Super. 355, 359, 509 A.2d 1314, 1316 (1986).

When an arrest occurs is a factual determination to be made by the suppression court. In reviewing such decisions, we are bound by the factual determinations as supported by the record. Moreover, we may consider only the Commonwealth's evidence and so much of the evidence for the defense, as, fairly read in the context of the record as a whole, remains uncontradicted. *Commonwealth v. McManus, supra*, 353 Pa.Superior Ct. at 358–359, 509 A.2d at 1315; *Commonwealth v. Crissy, supra*, at 450 A.2d at 90. With these principles in mind, we turn to the factual findings rendered by the suppression court.

By his Memorandum Opinion, dated December 17, 1981, the suppression judge held that Appellant was under arrest for the Kadunce murders when the arrest warrant was read to him in the Butler County Jail at 9:00 a.m., February 11, 1980, for *Davenport* rule purposes. Under this view, there was no violation of the *Davenport* decision since Appellant

was arraigned by 11:00 a.m. that morning. (M.O., 12/17/81, 2–3). We have painstakingly reviewed the record, and after affording proper consideration to the evidence, conclude that the suppression court's findings are adequately supported.

The transcript of the suppression hearing shows that Appellant was first questioned about the Kadunce murders in the middle of January 1980 while he was incarcerated in the Lawrence County Jail. (N.T., 8/29/80, 3). Towards the end of January, Appellant told the police that he had driven the "actors", in his car, to the Kadunce residence on the day the murders occurred. (N.T., 8/29/80, 9, 22). Subsequently, Officer Abraham, of the New Castle Police Department, made arrangements to have Appellant transported from the Lawrence County Jail to the Butler County Jail because Appellant felt that his physical well-being was in jeopardy. Officer Abraham testified that he had no further contact with Appellant until February 10, 1980.

On February 9, 1980, an arrest warrant was issued for Appellant. Officer Abraham visited Appellant at the Butler County Jail at approximately 10:00 a.m. the next morning. (N.T., 8/29/80, 26, 33). During that visit, Appellant gave an oral statement. (N.T., 8/29/80, 33). When asked if Appellant was told that he was under arrest for the Kadunce murders at that time, Officer Abraham related the following testimony:

Q. Did you advise him that he was under arrest for the murder of Kadunces?

A. I told him that we were going to be presenting him the arrest warrant as soon as we can make arrangements to transport him back.

\*       \*       \*       \*       \*       \*

Q. Okay. Then did you advise him of the warrant prior to taking that oral statment, or afterwards?

A. I advised him when we first started that he would be arrested on it.

Q. Was it your intent to advise him that he was at that particular time not arrested but would be at a later time?

A. I—well, I sort of hinted in a roundabout way, I told him he would be arrested, but there was a copy at the desk that we would be using as a detainer.

Q. Did you ever show him that warrant?

A. No, I didn't.

Q. Did you ever show him the complaint, or anything?

A. No, I didn't.

(N.T., 8/29/80, 26–27, 35–36).

The morning conversation was concluded by Officer Abraham with the advice that Appellant should consider his predicament and perhaps contact his attorney. (N.T., 8/29/80, 37). The police returned to meet with Appellant approximately at 6:00 or 7:00 p.m. that evening, at which time a taped statement was taken. (N.T., 8/29/80, 38–39). During this meeting, the warrant was neither shown to, or discussed with, Appellant. (N.T. 8/29/80, 39).

The following morning, February 11, 1980, the police returned to the Butler County Jail around 9:00 a.m. Appellant was shown for the first time the warrant for his arrest. (N.T. 8/29/80, 43). Appellant was arraigned on the murder charges and was then returned to the jail by 1:00 p.m. that afternoon. (N.T. 8/29/80, 43).

■ The record supports the suppression court's finding that Appellant was arraigned within the six-hour time limit set forth in *Davenport*. Preliminarily, we note that Appellant's arrest was the culmination of a month-long series of interviews with the police concerning his role in the Kadunce murders. The record shows that the police treated Appellant fairly during the course of the investigation and scrupulously honored his constitutional rights.

On February 10, 1980, the day before Appellant was actually arrested, he was notified that he would *soon be* served with the arrest warrant. In fact, Appellant was advised to evaluate his situation and perhaps contact an

attorney. However, Appellant was neither told that he was under arrest nor shown the arrest warrant. The testimony rendered by Officer Abraham clearly illustrates that Appellant was only put on notice that his arrest was imminent.

Contrary to Appellant's position, this notification cannot be construed to constitute a "neat bit of psychological coercion and durress used by the officers." (Appellant's Brief, 22). This theory is particularly untenable given the fact that Appellant was afforded the opportunity to contact an attorney but chose not to do so at that time. Rather, we regard the police's actions as means to merely prepare Appellant for the ensuing course of events. Accordingly, we are convinced that Appellant could not have concluded he was under arrest for the murders at any time prior to February 11, 1980, at 9:00 a.m., when he was actually served with the warrant. The attendant circumstances to the arrest simply do not support a contrary conclusion. Thus, we find no abuse of discretion committed by the suppression court in refusing to suppress Appellant's oral and written statements.

## III.

Based upon our disposition of Appellant's *Davenport* claim, we need not address the merits of Appellant's third assignment of error.

## IV.

Appellant contends that the Commonwealth failed at the Rule 1100 extension hearing to prove due diligence and that the trial court erred in granting the Commonwealth an extension of time within which to commence trial. Our task in analyzing whether an extension of time was properly given involves a determination of whether: 1. trial could not be commenced within 180 days despite the Commonwealth's due diligence; and, 2. trial was scheduled for the earliest, possible date consistent with the court's business. *Commonwealth v. Fortune*, 346 Pa.Super. 465, 468, 499 A.2d 1094, 1095 (1985). It is the Commonwealth's duty to meet this

burden of proof by a preponderance of the evidence. *Commonwealth v. Lamb*, 309 Pa.Super. 415, 423, 455 A.2d 678, 682 (1983). So, too, we are mindful that the decision by the trial judge to permit the Commonwealth a time extension is discretionary. Absent an abuse of such discretion we shall not disturb decisions of this nature. *Commonwealth v. Lohr*, 503 Pa. 130, 140, 468 A.2d 1375, 1380 (1983). With these principles in mind, we turn to the instant facts.

▮ The complaint charging Appellant with the Kadunce murders was filed on February 9, 1980. Thus, the 180th day would have expired on August 7, 1980. However, on July 14, 1980, the Commonwealth filed it "Application for Order to Extend Time of Trial". By this petition, it was alleged that, despite due diligence by the Commonwealth, trial could not be commenced within the 180–day period inasmuch as the duplicity and complexity of pre-trial motions filed by Appellant had entailed lengthy conferences and proceedings which, as of that date, were not completed. Following a hearing on the Rule 1100 issue, the trial court granted an extension until September 30, 1980.

The chronology of the pre-trial activity of this case is quite complicated. We have reviewed the transcript of the hearing on the Commonwealth's motion to extend as well as the various pre-trial documents filed by both parties with the trial court. After this arduous task, we agree with the trial court's conclusion that the Commonwealth had exhibited due diligence throughout the pre-trial phase of the case and that trial could not commence within the 180–day period. We base our determination largely upon the insightful Opinion of March 4, 1986, filed by the Honorable Glenn McCracken, Jr., which capsulizes the relevant facts involved. For this reason, we need not repeat that thorough analysis. However, we do find it beneficial to incorporate herein Judge McCracken's discussion regarding the Commonwealth's diligence during the pre-trial stage of Appellant's case:

Stipulations were filed on June 17 regarding discovery. To illustrate what matters were covered at that time, we

note from the record that the following was agreed to: that the defendant has made no confession, that the defense had received a copy of the autopsy report, that no murder weapons had been tested, that various objects found at the scene of the crime would be provided to defense counsel for inspection, the same provision would be made with regard to items seized from defendant's car, and that various statements from witnesses would also be supplied. Thus, while there was disagreement on certain items, it is clear that the District Attorney had provided and was prepared to provide much of what the defense was seeking. We cannot conclude that the position taken by the District Attorney was either dilatory or in bad faith. (We would note, in fact, that when the Commonwealth filed its answer to defendant's request, it requested a conference to resolve the discovery issues.) We next examine the record of the discovery hearing that was held on July 9. The District Attorney, occupied with another murder case in another courtroom, obtained a continuance thereof in order to attend the hearing, at which time the various disputes regarding evidence to be supplied to the defense was resolved. Our examination of the record does not lead us to find any lack of due diligence or lack of good faith on the part of the District Attorney.

At the extension hearing on August 14, the Commonwealth presented evidence that: this case involves two defendants; (N.T. August 14, p. 26) between 17 and 20 witnesses were called at the preliminary hearing (id. p. 27); the police continued to interview witnesses after the preliminary hearing (id. p. 28); between 75 and 100 potential witnesses were interviewed (id. p. 28); the police had between 15 and 20 witness statements (id. p. 28); the prosecuting police officer had worked almost every day and had spent much of his free time on the case (id. p. 29); he had attended several court hearings on discovery and had met several times with counsel for great lengths of time (id. pp. 31–32); defense counsel had been given the names of people interviewed and written statements of

witnesses who testified at the preliminary hearing (id. p. 32); evidence had been displayed to co-defendant's counsel (id. p. 32); another date was set up to complete the task at which 50 or 60 photos were shown, at which time all of defendant's questions had been answered (id. p. 34); the District Attorney was compiling a package of all statements which had been finished except for one statement obtained on the date of the hearing (id. p. 35); between 30 and 35 new witnesses had been interviewed since the grand jury (p. 43); the material to be shown defense counsel under the order of July 9 was at the police station to be seen, but a month had elapsed before anyone came to review it (id. pp. 47–48); and discovery conferences with counsel were held at the end of June and the beginning of July (id. p. 52). It was stipulated at the hearing that no answer to the Bill of Particulars was needed as the answers were incorporated in the notes of testimony (id. pp. 75–77). Docket entries of the case were admitted (id. p. 78). It was established that discovery conferences had been held on June 10 for three hours (id. pp. 84–85) on June 11 for two hours (id. p. 85) on June 12 for 1½ hours (id. p. 85) and again on June 17 from 5:00 to 8:00 p.m. (id. p. 90). There was an agreement to show counsel for both defendants all the evidence at one time after the Atkinson transcript had been prepared (id. pp. 94–95) and it was established that between 11 and 15 hours, exclusive of court time, had been spent on discovery (id. p. 108). After a careful review of the record, we are satisfied that the Commonwealth was duly diligent with regard to the discovery process. The delay of trial was caused by the nature of the case which involved a large number of witnesses (about 75), the volume of evidence in which two persons were charged with a double murder and pre-trial motions filed by defendant and the good faith disagreement regarding discovery.

In addition, there was an ongoing investigation right up to the day before the hearing on August 14, thus showing that the District Attorney's office was constantly occu-

pied with preparing the case for trial. When we consider that the District Attorney requested a hearing on the discovery issue, and considering as well the time he spent meeting with counsel for both defendants, we think it would be totally unreasonable and unrealistic to find a lack of due diligence. We therefore conclude that the Commonwealth met its burden of proving that the trial could not begin within the 180–day period despite due diligence of the Commonwealth, and that the order granting an extension was proper.

We note that the discovery process closely paralleled that of the co-defendant Costal whose trial did not commence until 338 days after his arrest. Costal's Rule 1100 issue, raised post trial, was decided adversely to him by this court. The Superior Court found Costal's Rule 1100 argument to be without merit without any discussion thereon. *Commonwealth v. Costal,* [351 Pa.Super. 200, 505 A.2d 337] No. 586 Pittsburgh, 1983, filed February 19, 1986.

Accordingly, we find that the trial judge exercised proper discretion in granting the Commonwealth an extension of time in which to commence trial.

## V.

Appellant argues that the trial court erred in refusing to grant his motion for a change of venue due to prejudicial pretrial publicity. An application for a change of venue is addressed to the sound discretion of the trial judge, and the exercise of such discretion shall not be reversed on appeal absent a finding of its abuse by the court. *Commonwealth v. Bradfield,* 352 Pa.Super. 466, 481, 508 A.2d 568, 575 (1986).

Ordinarily, one who alleges that he/she was denied a fair trial because of pre-trial publicity has the burden of showing actual prejudice in the empanneling of the jury. *Commonwealth v. Cooke,* 342 Pa.Super. 58, 63, 492 A.2d 63, 65–66 (1985). However, our Supreme Court has recognized instances where pre-trial publicity is so pervasive and in-

flammatory that the defendant's burden of proving actual prior prejudice is obviated. Pre-trial prejudice is presumed if: "(1) the publicity is sensational, inflammatory, and slanted towards conviction rather than factual and objective; (2) the publicity reveals the accused's prior criminal record, if any, or if it refers to confessions, admissions, or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports." *Commonwealth v. Pursell*, 508 Pa. 212, 221, 495 A.2d 183, 187 (1985) (citations omitted). The publicity must be so extensive and pervasive, without sufficient time between publication and trial for the prejudice to dissipate, that the community must be considered to have been saturated with it. *Ibid.*

Publicity related to the Kadunce murders began on or about July 11, 1978, the date of the murders. After a few weeks, news coverage on the deaths subsided and then picked up again in mid-February 1980 when Appellant and his co-defendant were formally charged with the homicides. The thrust of Appellant's claim of community prejudice centers on what he characterizes as "inaccuracy and conjecture on the part of the various reporters". (Appellant's Brief, 45). In particular, Appellant draws our attention to two news reports which occurred in the beginning of April, 1980. The first of these reports was broadcasted on April 8, 1980. This story intimated that the murders were connected somehow with satanic cults and that Appellant and his co-defendant were homosexual lovers. In addition, it was indicated that Appellant had been observed leaving the scene of the murders covered with blood. (N.T., 8/29/80, 84–85).

The second of these news stories was televised on April 10, 1980. Similar to the first report, this account described the brutality of the murders and stated that the two defendants were devil worshippers and homosexual. Appellant specifically alleges that this report was prejudicial insofar as it related that District Magistrate Howard Hanna, who

arraigned the two men, remarked that the men were, in his opinion, sick men. (N.T., 8/29/80, 89–91).

It is clear to us that the language found in these newscasts raises a number of red flags suggesting inherently prejudicial publicity. However, our analysis does not end at this juncture. The dissemination of such publicity does not automatically cause the presumption that a fair trial cannot be held. *Commonwealth v. Romeri*, 5J4 Pa. 124, 135, 470 A.2d 498, 503 (1983). We are cognizant that the critical factor in finding presumptive prejudice is whether the inherently prejudicial material in the news reports at issue was "recent" and "pervasive". *Id.* at 504 Pa. at 134, 470 A.2d at 503, quoting *Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287 (1978). Thus, we must determine whether there has been a "cooling off period" between the publicity and the beginning of trial. *Ibid.*, quoting *Casper, supra,* at 481 Pa. at 154, 392 A.2d at 293.

■ We are satisfied that there was a sufficient "cooling off period" during which any prejudice caused by the newscasts was dissipated. The two reports were televised at the beginning of April 1980. Trial did not commence until September 15, 1980. Thus, there was a period of more than 5 months in which the taint engendered by the sensational reports could subside. *See Commonwealth v. Pursell, supra,* at 508 Pa. at 222, 495 A.2d at 188 (six-month cooling off period found to be sufficient to dissipate prejudice). Moreover, news coverage appearing after April 1980 was sporadic and merely traced the pre-trial progress of the case. Although the record does not contain these news accounts, the trial court found them to be "factual and objective". (Memorandum Opinion, 12/17/81, 4). Likewise, we note that, other than challenging the prejudicial impact of the April 1980 reports, Appellant does not contend the balance of the news coverage afforded the Kadunce murders was inflammatory. Under these circumstances, we

find that the trial court did not abuse its discretion in denying Appellant's motion for a change of venue.[1]

## VI.

■ Appellant posits that the trial court erred in refusing to grant a mistrial after a spectator, in full view of the jury, allegedly made a "thumbs down" gesture. A mistrial is appropriate "only when an incident is of such a nature that its unavoidable effect is to deprive appellant of a fair trial". *Commonwealth v. Chestnut*, 511 Pa. 169, 176, 512 A.2d 603, 606 (1986), quoting *Commonwealth v. Hernandez*, 498 Pa. 405, 446 A.2d 1268 (1982). The decision to declare a mistrial is vested within the sound discretion of the trial court. Absent flagrant abuse of discretion, such decisions will not be disturbed on appeal. *Commonwealth v. Thomas*, 346 Pa.Super. 11, 17, 498 A.2d 1345, 1348 (1985).

In the area of bystander misconduct, it is within the purview of the trial judge's discretion to determine whether the defendant was prejudiced by the spectator's behavior. *Commonwealth v. Styles*, 494 Pa. 524, 529, 431 A.2d 978, 981 (1981). In the case *sub judice*, we cannot agree with Appellant's position that his right to a fair and impartial trial was irretrievably lost. The record illustrates that, after being notified of the spectator's gesture, the trial judge immediately took steps to determine the impact this behavior had on the jurors. (N.T., 10/1/80, 488). The trial court proceeded to question each juror as to whether or not the bystander's motions had any influence on them. The jurors responded negatively. Thereafter, a motion was presented to the trial court by defense counsel for a mistrial. This motion was denied by the trial judge who noted:

1. Appellant argues that 30% of the jurors called were dismissed due to having formed opinions. We do not consider this aspect of his argument inasmuch as the record, as sent to this court, does not contain a transcript of the voir dire proceedings. "[F]actual allegations, de hors the record, cannot be considered by a reviewing court and the practice of asserting facts in an appellant's brief, which allegations do not appear in the record, has recently again been condemned" by our Supreme Court. *Commonwealth v. Pursell, supra,* at 508 Pa. at 222–223, 495 A.2d at 188 (citations omitted).

THE COURT: Well, I would put on the record that in addition to the jurors' answers to my questions, which appear in the black and white record, my observance of their demeanor, and the way they reacted when they were asked about this, the Court is satisfied that they not only all said they weren't influenced by it, but we think that we are satisfied of their sincerity and the fact that they weren't effected [sic] by it; and so we will deny that motion for a mistrial.

(N.T., 10/2/80, 557–58).

From these circumstances, we are of the opinion that the trial court did not abuse its discretion in denying Appellant's motion for a mistrial. In fact, the record demonstrates that the trial judge conscientiously guarded Appellant's right to a fair and impartial trial.

## VII.

Appellant claims that he was denied the right to a speedy trial, as provided for under the Sixth Amendment, insofar as 5 years, 6 months, and 9 days elapsed between the jury's guilty verdict and the date of sentencing.

Our Supreme Court has enunciated a test by which to determine whether a defendant's constitutional speedy trial right has been violated. It must first be determined whether the delay itself is sufficient to trigger further inquiry. If so, the reviewing court will balance the length of the delay with the reason for delay, the defendant's timely assertion of the right to a speedy trial, and the resulting prejudice to the interests protected by the Sixth Amendment's right to a speedy trial. *Commonwealth v. Glover*, 500 Pa. 524, 529, 458 A.2d 935, 937 (1983), citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

In the case at bar, we find that the 5½ years delay in sentencing merits further inquiry by this Court. The second factor to be considered is the cause of the delay. The record shows that the Commonwealth did not attempt to delay the sentencing phase of Appellant's case. Rather, a

myriad of occurences transpired following Appellant's conviction that collectively caused the lengthy delay. Initially, trial counsel was disbarred which necessitated his successor to review over 3,000 pages of testimony in order to proficiently defend his client. However, the transcribed record was not made available to counsel until August 26, 1981, almost a year after the jury's verdict. However, Appellant's new counsel was also disbarred but failed to notify Appellant of this fact. Thus, nothing was done on Appellant's behalf until April 28, 1984, on which date Appellant was appointed his third counsel. It took nearly five months for the files and transcripts to be delivered to Appellant's new counsel for review and preparation of post-trial motions. However, Appellant did not have the benefit of this counsel for long since counsel withdrew in December of 1984 due to a conflict caused by third counsel's subsequent employment at the Public Defender's Officer. Finally, present counsel was appointed to represent Appellant. Argument on the post-trial motions was postponed until August of 1985 so that a proper review of the record could be conducted.

It is patently clear that the inordinate delay in sentencing was caused by the fact that Appellant had numerous attorneys representing him and the exorbitant amount of time that passed before Appellant's files were passed to each attorney. The bulk of this delay occurred for 3 years, during which, second counsel made no efforts to properly represent Appellant at the post-trial stage. The delay was not occasioned by a deliberate attempt by the Commonwealth to hamper Appellant's defense. In fact, the 5½ year deal was caused by negligence on the part of Appellant's attornies. For this reason, the responsibility for this lapse in time does not weigh heavily against the Commonwealth for purposes of this analysis. *Commonwealth v. Glover, supra,* at 500 Pa. at 528, 458 A.2d at 937.

The next factor to be considered is whether Appellant made a timely assertion of his right to a speedy trial. We

note from the record that Appellant made no attempt, prior to sentencing, to allege this infraction of his Sixth Amendment rights. Furthermore, when his oral motion to dismiss the charge for lack of speedy sentencing was denied, Appellant did not advance this claim in a motion to modify sentence. Thus, it cannot be said that Appellant made a timely assertion of his right to a speedy sentencing.

The final factor to be considered deals with whether the delay resulted in any prejudice to Sixth Amendment interests. "The particular interests that the Sixth Amendment was designed to protect are the following: to prevent oppressive pre-trial incarceration; to minimize anxiety and concern of the accused; and to limit the possibility that the defense will be impaired." *Commonwealth v. Glover, supra,* at 458 A.2d at 937, citing *U.S. v. Ewell,* 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). The last of these interests is of particular importance. *Ibid.* Other than citing the length of the delay in sentencing, Appellant has not supplied this Court with an indication as to how he has been prejudiced. The record reveals that, at the time Appellant was sentenced, he was serving a sentence of 4½ –9 years incarceration for rape and had never applied for parole even though his minimum had expired. We note, too, that the period of delay in sentencing did not exceed the collective minimum term of imprisonment to which he was sentenced for the charges *sub judice.* Thus, any claim of prejudice under these circumstances must fail.

After balancing the preceding four factors, we conclude that Appellant was not denied his right to a speedy trial. The cause for the delay was directly related to Appellant's counsels' actions, not dilatory tactics employed by the Commonwealth. Further, Appellant did not seek to assert his right for a speedy trial in a timely fashion. Finally, Appellant has not convinced us that he was in any way prejudiced by the delay.

Judgment of sentence affirmed.