STATE OF NORTH CAROLINA v. CHARLES RAY KIMBRELL

No. 83A87

(Filed 7 October 1987)

**Criminal Law § 34— improper questions concerning devil worship—prejudicial error**

The trial court committed prejudicial error in a prosecution for accessory before the fact to murder by permitting the district attorney to ask defendant about devil worshipping activities where the relative veracity of the State's two accomplice witnesses and the defendant was critical; no physical evidence linked defendant to the murder; both defendant and his wife gave testimony which exonerated defendant; the State's case against defendant rested in overwhelming measure on the testimony of two admitted drug addicts with crimi-

nal records who confessed to murdering and robbing the victims; and the Supreme Court could not confidently assume that the drug addicts would have been more worthy of belief than defendant had the District Attorney not been permitted to ask questions which probably inflamed the jury.

Justice MITCHELL dissenting.

APPEAL by defendant pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals finding no error in his trial before *Washington, J.*, at the 11 November 1985 Criminal Session of Superior Court, DAVIDSON County. *State v. Kimbrell*, 84 N.C. App. 59, 351 S.E. 2d 801 (1987). Defendant was convicted of two counts of accessory before the fact to second-degree murder and was sentenced to consecutive terms of twenty-five and fifty years imprisonment. Heard in the Supreme Court 8 September 1987.

*Lacy H. Thornburg, Attorney General, by Lucien Capone III, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by David W. Dorey, Assistant Appellate Defender, for defendant-appellant.*

MEYER, Justice.

The issue presented is whether the trial court committed reversible error by permitting the State, over objection, to cross-examine defendant about his knowledge of and participation in "devil worshipping" activities. The Court of Appeals found the evidence to be inadmissible under N.C.G.S. § 8C-1, Rules 610 and 403, but held that its admission did not constitute reversible error. We agree that the evidence was inadmissible. However, we find that defendant was indeed prejudiced by its admission, and we therefore reverse.

The State's evidence established that on 19 May 1984, Ricky and Pamela Norman were shot to death in their residence. James Clay ("Clay") Hunt was arrested and charged with the murder of the Normans. His sister, Donna Hunt, was subsequently arrested and charged with participation in the crimes. Both Clay and Donna Hunt testified for the State, pursuant to plea agreements.

Clay Hunt testified that from early 1983 through May 1984, he had been selling drugs (Dilaudid tablets), which defendant had

supplied. Defendant wanted Ricky Norman killed because he owed defendant a substantial sum of money, and on five or six occasions defendant asked Hunt if he would like to make some more money by killing Norman for him. On 18 May 1984, Clay and Donna Hunt visited defendant's residence to "shoot dope." Clay Hunt owed defendant approximately $1,200 at the time. Defendant offered to forgive the debt if Clay Hunt would kill Ricky Norman. Hunt agreed. Defendant instructed Clay Hunt to kill Pamela Norman as well, if she were there, since she would be a witness. Clay and Donna Hunt went to the Normans' residence to kill them, but they were not at home. On their second visit to the Norman residence, they found Ricky and Pamela at home, and Clay Hunt shot them both to death. The Hunts took approximately $1,500 in cash and some cocaine from the house.

Defendant took the stand on his own behalf. He testified that he had known the Normans but denied having had any drug-related transactions with them. He stated that the Hunts had come to his home at about midnight on 18 May 1984 and that both appeared to be under the influence of drugs. Clay Hunt told defendant that he thought he and his sister were being followed by a vehicle belonging to the Normans. Both the Hunts and defendant ingested some cocaine. The Hunts left defendant's home about thirty minutes later in Donna Hunt's car. Defendant's wife, Mary Kimbrell, corroborated defendant's testimony as to the time the Hunts arrived, as to Clay Hunt's statement that he and his sister were being followed, and as to the approximate time of their departure.

After defendant's arrest and while he was in custody, he made a statement in which he referred to his knowledge of and participation in "black magic" activities with a group that included Ricky Norman and others. At trial, the State's cross-examination of defendant was based, in part, upon defendant's prior statement. The questions which defendant challenges are as follows:

Q. Have you done any devil worshipping?

A. No, sir.

    MR. KLASS: Object.

    THE COURT: Overruled. EXCEPTION NO. 3

MR. ZIMMERMAN: Thank you.

Q. Have you ever been to any ceremonies?

A. No, sir.

Q. Have you seen things at night?

A. No, sir.

Q. Birds, hawks, dogs, a number of things?

A. No, sir.

Q. You don't recall telling Special Agent Leggett of the SBI that you saw those things?

A. No, sir.

Q. "I saw a goat head made out of brass in the vision"?

MR. LOHR: Objection.

THE COURT: Overruled. EXCEPTION NO. 4

Q. And you and Luther on Friday the 13th—April, Friday the 13th, you-all were supposed to go to a seance, isn't that right?

A. That's what Bobby Tucker said.

Q. Huh?

A. That's what Curtis Robert Tucker said.

Q. Well, you were supposed to go, weren't you?

MR. LOHR: Objection.

THE COURT: Overruled. EXCEPTION NO. 5

A. I was inivited [sic].

THE COURT: You may answer the question.

A. (continuing) I was invited to it, and when I got up on Main Street to go down toward Luther's house I seen some police officers going down towards Luther's, and I kept going straight.

Q. A police officer?

State v. Kimbrell

A. I seen two carloads going down towards Luther's.

Q. And of course that scared you?

A. Yes, sir.

. . . .

Q. Did you tell them you wanted to show them something that Bob and Luther gave you about some little swords — some little bitty swords, something about they had power?

A. That's what they told me.

MR. LOHR: Objection.

THE COURT: Overruled. EXCEPTION NO. 6

Q. Go ahead. What? Answer the question. You've got to answer the question.

A. I told them about the swords, yes, sir. I wasn't talking about myself, I was explaining about Luther Flynn at the time, if you'll remember.

Q. You had one of these black magic bibles, too, didn't you?

A. No, sir.

MR. LOHR: Objection.

THE COURT: Overruled. EXCEPTION NO. 7

Q. Who had the bible? Who had the bible?

A. Luther Flynn had the bible.

Q. Had he ever read any of it to you?

A. Yes, sir.

MR. LOHR: Objection. Objection.

THE COURT: Overruled. EXCEPTION NO. 8

Q. Were Ricky and Pam Norman involved in this black magic stuff?

A. I don't know, sir.

Q. What did that consist of? Worshipping the devil?

MR. LOHR: Objection.

THE COURT: Overruled. EXCEPTION NO. 9

A. I don't know, sir.

Q. What did that black bible Luther had have to say about it?

MR. LOHR: Objection.

THE COURT: Overruled. EXCEPTION NO. 10

Q. You can answser [sic].

A. It's just a bunch of words. I don't know. I didn't pay any attention to it.

The Court of Appeals was unanimous in finding that admission of this evidence was error under North Carolina Rules of Evidence 610[1] and 403.[2] *Kimbrell*, 84 N.C. App. at 64-65, 351 S.E. 2d at 804. The panel divided, however, in its assessment of the evidence's prejudicial effect. The question of the prejudicial effect of the evidence was the only issue addressed in the dissent, and under Rule 16(b) of the North Carolina Rules of Appellate Procedure, that issue is the only one before us.

In order to show prejudicial effect which rises to the level of reversible error, a defendant must demonstrate that "a reasonable possibility [exists] that, had the error in question not been committed, a different result would have been reached at the trial." N.C.G.S. § 15A-1443(a) (1983). *See State v. Scott*, 318 N.C. 237, 347 S.E. 2d 414 (1986). Defendant has done so.

The outcome of the trial depended on the jury's perception of the relative veracity of the witnesses. Both the Hunts stood to gain by testifying against defendant because the charges against them were thereby reduced to second-degree murder. The evi-

---

1. "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced; provided, however, such evidence may be admitted for the purpose of showing interest or bias." N.C.G.S. § 8C-1, Rule 610 (1986).

2. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1986).

dence indicated that the Hunts could have had a personal motive to kill and rob Ricky Norman, independent of the proposition made to them by defendant. When they went to his house on 19 May 1984, the Hunts told Norman they wanted to purchase drugs, when in fact they had no money with which to pay for them. Having killed Norman and his wife and having stolen both drugs and cash, the Hunts spent the next two days feeding their drug habits and using the money to purchase more drugs. The evidence further indicated that while in jail, Clay Hunt tried to bribe defendant into paying him $1,000 in return for his not taking the stand against defendant.

Other than the evidence relating to "devil worshipping," the State's impeachment of defendant showed that he had had an extramarital affair with Donna Hunt; that he had purchased some Dilaudid tablets for her at her request; that he had sold marijuana; and that he had a criminal record consisting of two counts of misdemeanor possession of marijuana, one count of speeding, and one count of littering. However, defendant's testimony as to the events of the night of 18 May 1984, if believed, exonerated him of involvement in the Norman murders.

The State contends that defendant's denials that he engaged in "devil worshipping" ceremonies or paid any attention to the "black magic bible" mitigated any prejudicial effect that the questioning itself may have had. The State describes the questions as a minute portion of the trial upon which the jury would have been most unlikely to have based their verdict because of the substantial evidence of defendant's guilt supplied by the Hunts. We disagree. The real effect of questions about devil worship, satanic bibles, graveyard seances, and the like, which in this particular case had little or no probative value, can only have been to arouse the passion and prejudice of the jury. We do not believe that this defendant's simple denials sufficiently mitigated the damage done to his case by these questions. We find support for our conclusion in decisions from other jurisdictions. *See, e.g., People v. Brown,* 107 Ill. App. 3d, 437 N.E. 2d 1240 (1982) (trial court properly refused to allow defendant to raise witchcraft accusation against complainant in indecent liberties with a child case, since not related to crime charged); *Commonwealth v. Atkinson,* 364 Pa. Super. 384, 528 A. 2d 210 (1987) (pretrial publicity intimating that murders with which defendant was charged were connected with

satanic cults inherently prejudicial if insufficient time lapse between publication and trial). *But see State v. Waterhouse*, 513 A. 2d 862 (Me. 1986) (evidence of defendant's belief in satanism admissible to prove killer's identity and intent); *Commonwealth v. Chuck*, 227 Pa. Super. 612, 323 A. 2d 123 (1974) (where issue was witness' competency to testify, jury could be apprised of his belief in Satan).

In this case, the relative veracity of the State's two accomplice witnesses and the defendant was critical. No physical evidence linked defendant to the murders. Both he and his wife, Mary Kimbrell, took the stand and gave testimony which exonerated him from guilt. The State's case against defendant rested in overwhelming measure on the testimony of Clay and Donna Hunt, who had confessed to murdering and robbing Ricky and Pamela Norman. Both were admitted drug addicts with criminal records. We cannot confidently assume that the Hunts would have been more worthy of belief than defendant had the district attorney not been permitted to ask questions which probably inflamed the jury. Indeed, as the Court of Appeals itself pointed out, "accusations or insinuations of participation in 'devil worship' clearly carry with them a great potential for prejudicial impact on defendant's credibility." *Kimbrell*, 84 N.C. App. at 65, 351 S.E. 2d at 804.

We hold that the trial court committed reversible error in permitting the district attorney, over objection, to ask defendant questions about devil worshipping activities. Defendant is entitled to a new trial. Accordingly, we reverse and remand to the Court of Appeals with instructions to that court to remand to the Superior Court, Davidson County, for further proceedings in accordance with this opinion.

Reversed and remanded.

Justice MITCHELL dissenting.

For the reasons given by the majority in the Court of Appeals, 84 N.C. App. 59, 351 S.E. 2d 801 (1987), I am convinced that the trial court's error in permitting the questioning of the defendant as to whether he had "done any devil worshipping" — which he denied in each instance — was harmless error. Therefore, I must respectfully dissent.