Commonwealth v. Rivera

C.P. of Lehigh County, no. 2004/4257.

*Maria Dantos,* for Commonwealth.
*Glennis L. Clark,* for defendant.

BLACK, *J.,* May 17, 2005—Defendant, Fernando Luis Rivera, is charged with two counts of criminal homicide[1] in the shooting deaths of Bernardo Salcedo and Enrique Galoan-Rosas on Chew Street in Allentown, Pennsylvania, on October 26, 2003. Defendant is also charged with two counts of robbery,[2] one count of possessing an instrument of crime,[3] and one count of criminal conspiracy[4] arising from the same incident.

Before the court are defendant's omnibus pretrial motions, which include (1) a motion for change of venue, (2) a motion for severance, (3) a motion to strike notice of intent to seek the death penalty, (4) a motion to suppress statements made by defendant to Allentown Police Detectives Thomas M. Fallstitch and Robert Palmer, (5) a motion to quash the information, (6) a motion to compel discovery, (7) a motion for the production of photographs in the Commonwealth's possession, and (8) a motion for an extension of time for filing additional omnibus pretrial motions.

---

1. 18 Pa.C.S. §2501(a).
2. 18 Pa.C.S. §3701.
3. 18 Pa.C.S. §907.
4. 18 Pa.C.S. §903.

A hearing on these motions was held on February 22, 2005. At that time defendant withdrew the following motions as moot: (1) the motion to compel discovery, based on the Commonwealth's representation that all discovery material had been provided; (2) the motion for photographs, since defendant had received them; and (3) the motion for severance, since the Commonwealth stated that defendant would be tried separately. In addition, the court allowed defendant an extension for the filing of additional omnibus motions, as requested. The remaining motions are discussed below.

## I. MOTION FOR CHANGE OF VENUE

Defendant seeks a change of venue pursuant to Pa.R.Crim.P. 584, on the ground that the pretrial publicity given to this case in the news media prevents him from receiving a fair trial in Lehigh County. Rule 584 states the following:

"All motions for change of venue or for change of venire shall be made to the court in which the case is currently pending. Venue or venire may be changed by that court when it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending."[5]

Such a motion is based on the guarantee of an impartial jury provided in Article 1, Section 9, of the Pennsylvania Constitution and the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. See *Commonwealth v. Stevens,* 543 Pa. 204, 670 A.2d 623 (1996).

---

5. Pa.R.Crim.P. 584(A).

Whether to grant a change of venue lies within the discretion of the trial court. *Commonwealth v. McCullum,* 529 Pa. 117, 602 A.2d 313 (1992); *Commonwealth v. Tedford,* 523 Pa. 305, 567 A.2d 610 (1989). Generally, a defendant seeking a change of venue on the basis of pretrial publicity must show actual prejudice in the impaneling of the jury. *Commonwealth v. Casper,* 481 Pa. 143, 392 A.2d 287 (1978); See also, *Commonwealth v. Breakiron,* 524 Pa. 282, 571 A.2d 1035 (1990). However, where the publicity has been so sustained, so pervasive, so inflammatory and so inculpatory that there is a substantial likelihood that defendant cannot receive a fair trial, then a change of venue will be appropriate, even without proof of actual jury prejudice. *Casper,* 481 Pa. at 151, 392 A.2d at 291.

In the instant case, defendant argues that articles published in *The Morning Call,* a newspaper of general circulation in Lehigh County, contained inflammatory and prejudicial information about the crimes at issue. After the omnibus pretrial hearing, defendant submitted copies of eight articles published in *The Morning Call* between October 27, 2003, and December 8, 2004.[6] Defendant claims that, as a result of these articles, he is unable to get a fair and impartial trial in Lehigh County.

In determining whether pretrial publicity requires a change of venue, a court is to follow a three-step process. First, the court must analyze the pretrial publicity to determine whether the material circulated is inherently prejudicial. In doing so, the court is to consider: (1) whether the publicity was factually or objectively oriented, as opposed to being inflammatory or sensational,

6. Stipulation filed March 17, 2005.

demanding a conviction; (2) whether the publicity revealed a prior criminal record on the part of defendant; (3) whether the publicity referred to confessions, admissions, or reenactments of the crime by defendant; and (4) whether the publicity indicated that the information revealed was from police or prosecutorial reports. *Casper,* 481 Pa. 152-53, 392 A.2d at 292; see also, *Breakiron,* 524 Pa. at 287, 571 A.2d at 1037.

If any one of these four elements appears in the pre-trial publicity, the court must then proceed with a second step, which is to ascertain how extensive and sustained the publicity has been, focusing on the pervasiveness of the publicity as well as the size and area of the community involved. *Casper,* 481 Pa. at 153, 392 A.2d at 292. The purpose of such an analysis is to determine if the area from which the jury will be drawn has been saturated with this publicity. *Id.*

Finally, if the nature of the publicity is found to be inherently prejudicial and this publicity is found to have saturated the area from which the jury will be selected, the court must then follow a third step, which is to determine if "there was a sufficient proximity in time between the publicity and the selection of a jury such that the community from which the jury was drawn did not have the opportunity to 'cool down' from the effects of the publicity, thus making a fair trial in this community impossible." *Breakiron,* 524 Pa. at 287, 571 A.2d at 1037.

After reviewing the articles submitted, we find that one of them was inherently prejudicial. The article published on December 8, 2004, reported on the preliminary hearing before District Justice David Leh and referred to testimony of police detectives about inculpatory

statements by defendant. Police detectives are quoted in the article as testifying, "He said he didn't mean to kill anyone, that it just happened." Given the content of this article, we must presume that it was prejudicial to defendant. *Commonwealth v. Karenbauer,* 552 Pa. 420, 434, 715 A.2d 1086, 1092 (1998).

We note, however, that the prejudicial statements were limited to the December 8, 2004 article. The remaining seven articles were factually oriented about the crime and did not make reference to defendant's inculpatory statements. The tone of these other articles was not inflammatory. Some of the articles contained statements from defendant's neighbors that violent activity had been increasing in their neighborhood, but none of the material came even close to implicating defendant or calling for or demanding a conviction. None of the articles referred to a prior criminal record.

Although the December 8, 2004 article was inherently prejudicial, we find that the pretrial publicity in toto was not so sustained or pervasive as to have saturated the community. See *Commonwealth v. Young,* 561 Pa. 34, 66-67, 748 A.2d 166, 183 (1999). *The Morning Call* does have a substantial circulation in Lehigh County, but we do not believe that the eight articles published in this newspaper over a period of six months, none of which was inflammatory in tone and only one of which made reference to inculpatory statements, could conceivably have saturated the community with prejudicial material about this case. Hence we are unable to conclude that Lehigh County was saturated with prejudicial media coverage.

Finally, addressing the third step, we must consider whether there has been a considerable delay between the

prejudicial media coverage and the trial itself. We conclude that there has been. All eight articles were published on or before December 8, 2004, almost nine months prior to the scheduled trial date of September 6, 2005.[7] As a result, there has been a substantial cooling-off period, sufficient for any prejudicial effect of the media coverage to have dissipated. See *Commonwealth v. Galloway,* 495 Pa. 535, 434 A.2d 1220 (1981) (five-and-a-half-month cooling-off period sufficient); *Commonwealth v. Pursell,* 508 Pa. 212, 495 A.2d 183 (1985) (six-month cooling-off period sufficient); *Commonwealth v. Atkinson,* 364 Pa. Super. 384, 528 A.2d 210 (1987) (five-month cooling-off period sufficient); see also, *Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395 (1994) (denying change of venue motion even though some objectionable articles appeared two months prior to trial where the bulk of the sensational reports occurred approximately seven months prior to trial).

For the reasons stated, we do not believe that defendant has established a sufficient basis for a change of venue. We note that there have been prior Lehigh County cases that generated much greater publicity, and publicity that was much more inflammatory than anything in this case. Yet in none of these cases was actual prejudice found in the jury selection process. See *e.g., Commonwealth v. Rorrer,* C.C.P. Lehigh, no. 2176/1997 (defendant charged with kidnapping and killing former husband's wife and her four-month-old child); *Commonwealth v. Robinson,* C.C.P. Lehigh, no. 55/1994 (alleged serial rapist and killer). Therefore, we do not anticipate

---

7. The trial date has been twice postponed at defendant's request to allow his counsel more time to prepare.

that the pretrial publicity will present any difficulty in selecting a fair and impartial jury for this case. Defendant has not submitted any statistical survey information that would lead us to believe otherwise. Accordingly, defendant's motion for change of venue is denied.

## II. MOTION TO STRIKE NOTICE OF INTENT TO SEEK THE DEATH PENALTY

At the February 22, 2005 hearing, defendant's counsel conceded that the Commonwealth's notice to seek the death penalty meets the legal standards for seeking the death penalty under current appellate law in the Commonwealth. In light of this, defendant's motion to strike the notice of intent to seek the death penalty is denied.

## III. MOTION TO SUPPRESS STATEMENTS TO POLICE

Defendant contends that the statements he made to Allentown Police Detectives Thomas M. Fallstitch and Robert Palmer on February 5, 2004, should be suppressed on two grounds—first, that the detectives continued questioning him after he had invoked his right to counsel and his right to remain silent; and, second, that he did not make a knowing, voluntary waiver of these rights. At the hearing on defendant's motion to suppress, Detectives Fallstitch and Palmer both testified for the Commonwealth regarding their interrogation of defendant on this date. The Commonwealth also offered into evidence the rights and warning waiver form signed by defendant[8]

---

8. Commonwealth exhibit 1.

and the typed interview notes of Detective Palmer.[9] Defendant did not offer any evidence at the hearing.

Based on the evidence presented, we find that the interrogation of defendant did continue after he had invoked his *Miranda* right to remain silent. Accordingly, his statements to Detectives Fallstitch and Palmer on February 5, 2005, after he informed them he did not want to answer questions about the incident must be suppressed.

## A. *Findings of Fact*

The following facts were established at the hearing:[10] On February 5, 2005, Allentown Police Detectives Thomas M. Fallstitch and Robert Palmer traveled to Manhattan, New York, for the purpose of interviewing defendant about the double homicide with which he had been charged. Defendant had been apprehended and was being held in custody by the New York Police Department on an outstanding fugitive warrant in connection with this charge. He was held in the central booking area known as the Tombs.

Initially, the detectives met with defendant briefly in a holding cell in the basement area of the Tombs. This cell was a large, empty room; only defendant and the two detectives were present. Detective Fallstitch introduced himself and Detective Palmer. He then told defendant that they had come from Allentown and wanted to speak

9. Commonwealth exhibit 2.

10. The recollections of Detectives Fallstitch and Palmer of their meetings with defendant differed in some respects. In this circumstance we have placed considerable reliance on the interview notes prepared contemporaneously by Detective Palmer.

to him regarding the double homicide for which he had been arrested. Defendant indicated that he had no problem talking with the detectives, but that there were some things he would not talk about. Detective Fallstitch told defendant that was fine. He said that the detectives would meet up with defendant later when they would have more time to talk. The meeting was then adjourned so that prison officials could complete defendant's intake processing.

After the processing was finished, defendant met with Detectives Fallstitch and Palmer a second time later that day. The second meeting took place around midnight in an old holding cell that had been turned into a "break" room. The room was approximately 15 feet by 15 feet in size, and contained lockers, desks, chairs, refrigerator and a sofa. Defendant was not handcuffed. Only the two detectives were present with defendant in the room for most of the meeting, though there were occasional interruptions by others moving in and out of the room. A sergeant's station was located outside the door of the room, within sight of defendant. The detectives were unarmed, their weapons having previously been secured in a locked facility. Prison officials did not permit the detectives to bring any recording devices with them to the meeting room.

At the start of this second interview Detective Fallstitch again introduced himself and Detective Palmer. He indicated that they were there in reference to defendant's arrest warrant on the charge of two counts of homicide arising from an incident on Chew Street in Allentown. Detective Fallstitch stated that he would like to speak with defendant regarding that incident and pre-

sented him with a *Miranda* rights and waiver form.[11] Detective Fallstitch read this form to defendant and gave him an opportunity to review it himself. Defendant read the form and then signed it. He appeared to understand the form and had no questions about its content.

After signing the *Miranda* rights and waiver form, defendant stated to the detectives that he was aware of the charges and that "he did not want to talk specifically about the incident but would answer some of Fallstitch's questions." [12] Detective Fallstitch then proceeded to ask defendant some questions about the incident. Detective Fallstitch said to defendant that he wanted to know "why this happened, how it happened, his side of the story." [13] In response defendant made the following statements:

• I feel sorry but I can't change what happened, what I did.

• I was waiting for you to come. I'm glad it's over.

• I know what I did.[14]

The following colloquy ensued:

• Fallstitch: I have everything I need to go through with this.

• Rivera: I know you do. I know what I did and it was wrong.

• Fallstitch: The truth always sets you free.

• Rivera: I know, I know.

• Fallstitch: Why did this happen?

---

11. Commonwealth exhibit 1.
12. Commonwealth exhibit 2.
13. Notes of testimony of hearing 2/22/05 at 21-22.
14. Commonwealth exhibit 2.

• Rivera: I don't trust people because of my shoplifting case. People didn't believe me.

• Rivera: I didn't plan to kill anyone. It just happened.

• Fallstitch: I want to hear your side of the story.

• Rivera: I would love to tell you but I can't until I see a lawyer.[15]

At this point defendant declined to speak further with the detectives without first speaking with an attorney. The detectives then concluded the interview. It had lasted approximately 30 minutes.

During the interview Detective Fallstitch had asked all the questions. Detective Palmer had sat off to the side and made notes, which he later typed up. These typewritten notes were admitted into evidence as Commonwealth exhibit 2.

## B. *Discussion and Conclusions of Law*

In *Miranda v. Arizona,* 384 U.S. 436, 473-74, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court enunciated the following rule for police questioning of a person in custody:

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation op-

---

15. *Id.*

erates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."

The court elaborated on this principle in *Michigan v. Mosely,* 423 U.S. 96, 103-104 (1975) as follows:

"Through the exercise of his option to terminate questioning he (the suspect) can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether the 'right to cut off questioning' was 'scrupulously honored.' "

In *U.S. v. Tyler,* 164 F.3d 150 (3d Cir. 1998), *cert. denied,* 526 U.S. 1077 (1999), the Third Circuit reaffirmed the duty on the part of police to "scrupulously honor" a defendant's right to remain silent. The court held that, once a defendant declares that he does not wish to make a statement, the police may not initiate or continue any further questioning of defendant. See also, *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981) (holding that restatement of rights and re-inititation of interrogation by police do not overcome defendant's prior invocation of right to counsel); *Commonwealth v. Zook,* 520 Pa. 210, 553 A.2d 920 (1989) (holding that defendant's request to call his mother to get an attorney was an invocation of *Miranda* rights, requiring that further questioning must end). In *Commonwealth v. Peterson,* C.C.P. Lehigh, no. 1999/3684 (April 13, 2000), our colleague, the Honor-

able Robert L. Steinberg, extensively summarized the case law on this topic.

In *Commonwealth v. Mercier,* 451 Pa. 211, 302 A.2d 337 (1973), the defendant, who had been arrested for robbery and murder, invoked his right to counsel and refused to answer questions until counsel was provided. The police shortly afterwards read to the defendant a statement made by an accomplice, who implicated the defendant in the crime. This prompted the defendant to waive his right to counsel and confess. The court held that, despite the defendant's waiver of his right to counsel, the confession was inadmissible because the reading of the accomplice's statement, which prompted the waiver and confession, was tantamount to continued police interrogation. The court stated:

"[R]eading the statement after appellant had exercised his *Miranda* rights was totally impermissible. Interrogation should have ceased once the appellant exercised his constitutional rights, and, since we hold the reading of the statement of a third party to appellant was a form of interrogation, obviously interrogation did not cease. Hence, the police violated the mandate of *Miranda.*" *Id.* at 215, 302 A.2d at 340.

In the instant case, the detectives immediately stopped questioning defendant once he made a request for assistance of counsel. However, Detective Fallstitch did not "scrupulously honor" defendant's right to remain silent. According to Detective Palmer's written interview summary, after defendant signed the *Miranda* rights and waiver form, defendant stated that "he did not want to talk specifically about the incident but would answer some of Fallstitch's questions." At this point

interrogation about "the incident" should have ceased. One would have to be very naive to interpret defendant's reference to "the incident" as a reference to anything other than the double homicide on Chew Street in Allentown for which defendant had been arrested, and which the detectives had informed him was the reason for their visit.

In order to invoke the right to remain silent, a defendant must make some statement or gesture that can be reasonably construed as an expression of that right. Here defendant did so. Under the legal principles noted above, once defendant stated that he did not wish to talk "specifically about the incident," interrogation designed to elicit information about that incident should have ceased.

The Commonwealth argues that, before making the inculpatory statements, defendant had indicated that he would answer some of Detective Fallstitch's questions. However, defendant's agreement to answer some questions was accompanied by his statement that he did not want to talk specifically about the incident. Any reasonable interpretation of defendant's complete statement is that, while he would discuss some matters with the detectives, he was not willing to discuss the double homicide for which he had been taken into custody.

Detective Fallstitch did not "scrupulously honor" defendant's invocation of his right to remain silent regarding the double homicide. Instead, the detective immediately proceeded to ask questions that were clearly intended to elicit information about this incident. In doing so, Detective Fallstitch violated defendant's right to remain silent under the Fifth Amendment of the United States Constitution.

The Commonwealth relies on the case of *Commonwealth v. Lark,* 316 Pa. Super. 240, 462 A.2d 1329 (1983), but this reliance is misplaced. In *Lark,* the defendant stated to the police interrogators that he would *not* talk about the murder for which he had been arrested, but that he would talk about everything else. He then proceeded to confess to a robbery. Thus, *Lark* is the converse of this case. In *Lark,* the inculpatory statement from defendant related to an incident other than the murder that he had stated he would not discuss. Here defendant was interrogated about the very incident he said he did not wish to discuss. Such interrogation was clearly in violation of defendant's constitutional rights.

For these reasons, the inculpatory statements made by defendant on February 22, 2005, in response to questions from Detective Fallstitch, after defendant had said he did not wish to talk specifically about the incident, are inadmissible at the trial of this case. Defendant's motion to suppress these statements must therefore be granted.

## IV. MOTION TO QUASH THE INFORMATION

Defendant claims that the evidence presented at the preliminary hearing held before District Justice David Leh on December 7, 2004, was insufficient to establish probable cause. He contends that there is no direct evidence against him.

However, the transcript of the preliminary hearing[16] reveals that the alleged co-conspirator, Rienaldo Ortiz, testified very specifically about defendant's role in the

---

16. Commonwealth exhibit 3.

double homicide. Ortiz testified that, on the night of October 26, 2003, he, along with Luis Lugo, Miguel Morales and defendant, intended to steal cocaine from the victims,[17] and that, during the transaction, defendant shot both of the victims.[18] This testimony clearly implicates defendant in the crimes with which he has been charged.

Defendant argues that Ortiz was a co-conspirator. However, a criminal conviction may rest upon the uncorroborated testimony of a co-conspirator. *Commonwealth v. Gordon,* 254 Pa. Super. 267, 385 A.2d 1013 (1978). The credibility of Ortiz is for the fact-finder to determine. His testimony against defendant is sufficient to establish probable cause. Hence defendant's motion to quash the information is denied.

## ORDER

Now, May 17, 2005, upon consideration of defendant's omnibus pretrial motions filed January 21, 2005, and after hearing thereon, for the reasons set forth in the accompanying opinion, it is ordered as follows:

(1) Defendant's motion for change of venue is denied.

(2) Defendant's motion for severance is withdrawn as moot.

(3) Defendant's motion to strike notice of intent to seek death penalty is denied.

(4) Defendant's motion to suppress statements made on February 5, 2005, to Allentown Police Detectives

---

17. N.T. 12/7/04, 19.
18. N.T. 12/7/04, 21.

Thomas M. Fallstitch and Robert Palmer is granted, and the statements are suppressed.

(5) Defendant's motion to quash the information is denied.