STATE OF NORTH CAROLINA v. SHAFEEQ WAHEED SHAMSID-DEEN

No. 367PA88

(Filed 8 June 1989)

1. **Criminal Law § 34.8; Rape and Allied Offenses § 4.1— prior sexual acts against victim—admissibility to show common scheme**

In a prosecution of defendant for the first degree rape of his twenty-year-old daughter, prior similar sexual acts committed by defendant against his daughter over an eleven-year period were not too remote to be considered as evidence of defendant's common scheme or plan to abuse his daughter sexually. When similar acts have been performed continuously over a period of years, the passage of time serves to prove, rather than disprove, the existence of a plan.

2. **Criminal Law § 162— failure to object to testimony—waiver**

Defendant waived his right to assert error on appeal to the admission of testimony where he failed to except to an adverse ruling on voir dire, but admitted that the evidence was competent, and failed to object upon presentation of the testimony before the jury. N.C.G.S. § 8C-1, Rule 404(b).

3. **Criminal Law § 34.8; Rape and Allied Offenses § 4.1— sexual acts with victim's sisters—admissibility to show common scheme**

In a prosecution of defendant for first degree rape of his twenty-year-old daughter, testimony by the victim's sisters that defendant had forced them to have sexual intercourse with him in the past was admissible to show a common plan or scheme embracing the offense charged where the evidence revealed a pattern by defendant over a twenty-year period of forcing daughters to submit to intercourse as they reached puberty and continuing to assault them, using whatever force was necessary, into their adulthood and after they had left home.

4. **Criminal Law § 146.4— constitutional questions—necessity for raising in trial court**

Constitutional claims not raised at trial or in the assignments of error will not be considered on appeal.

5. **Criminal Law § 86.1— religious beliefs of defendant—questions not plain error**

In a prosecution of defendant for the rape of his daughter, questions asked defendant on cross-examination concerning his religious beliefs did not constitute fundamental or plain error where the appellate court could not conclude that the jury probably would have reached a different verdict absent the questions regarding defendant's religion.

6. **Criminal Law § 169.3— objection to evidence—same evidence admitted without objection**

The benefit of an objection to a question asked defendant as to whether a father in a Muslim family is a very powerful figure was lost when essentially the same question was asked without objection immediately thereafter.

**7. Criminal Law § 86.1; Rape and Allied Offenses § 4— religious teachings of children—question to defendant not improper**

In a prosecution of defendant for the first degree rape of his twenty-year-old daughter, a question asked defendant during cross-examination about his religious beliefs as to whether his children were taught not to have sex with anyone but their father was not an improper question insulting the Islamic religion where the context makes it clear that Muslim doctrine forbids premarital sex, and the State's apparent motive for questioning defendant about his religion was to show how he was able to intimidate his daughters into having sexual relations with him over a long period of time.

Justice MITCHELL concurring.

Justice MARTIN joins in this concurring opinion.

ON writ of certiorari from a judgment imposing a mandatory sentence of life imprisonment entered by *Lewis (Robert D.), J.,* at the 9 May 1984 Criminal Session of Superior Court, MECKLEN-BURG County, upon defendant's conviction of first degree rape. Heard in the Supreme Court 9 May 1989.

*Lacy H. Thornburg, Attorney General, by Clarence J. Delforge, III, for the State.*

*Irving Joyner for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of the first degree rape of his daughter and sentenced to life imprisonment. We find no error.

The State's evidence, in pertinent summary, showed the following:

The victim, defendant's twenty-year-old daughter, testified that during the first week of August 1983 defendant called her at work and told her he wanted to talk things over and reconcile their relationship. The victim initially refused to see him, but defendant repeated that he "would be a different person" and "just wanted to talk things out" with her. She then agreed to have dinner with him. He picked her up from work and took her to a restaurant. Defendant told the victim that he was sorry for the trouble and embarrassment he had caused her in April 1983. The two had not been on speaking terms since April. After dinner they sat in the car in the parking lot of the restaurant and talked

further. The victim fell asleep in the car because she had risen that morning at 4:00 a.m. in order to be at work at 5:00 a.m.

The victim testified that when she awoke she and defendant were out in the country in a wooded area. Defendant was on top of her trying to pull her pants down. He pulled her out of the front seat and pushed her into the back seat of the car. Defendant told the victim she was "going to give him some" or he would kill her. He picked up a gun from the floor of the car and pointed it at her. This scared the victim so that she "let him do what he had to do." Defendant touched her breasts and vagina, then inserted his penis in her vagina. Afterwards, defendant drove the victim back to her car.

The victim did not report the incident to the police. Later that month or the next the victim talked to her younger brother on the telephone. As a result of that conversation the victim became very upset and contacted the social services department. Personnel from the department then contacted the police regarding the rape.

The victim testified that defendant had forced her to submit to his sexual advances since she was five years old. When she was five defendant began fondling her genitals. When she turned nine defendant began having intercourse with her approximately once a week. As she grew older the intercourse occurred almost daily. Defendant threatened the victim with guns, knives, and beatings if she resisted him. Defendant hit the victim with his fists many times when she rejected his overtures.

The victim testified that she left home to go to college in Greensboro. While she lived in the dormitory defendant often sent her letters, flowers and candy, and he called her daily. He visited frequently and asked her to go off with him. The victim tried to avoid defendant by not answering telephone calls or messages. She did have intercourse with defendant more than one time in her dormitory room.

Defendant visited the victim in April 1983 at her dormitory. Defendant told her he wanted to be with her, which she interpreted to mean he wanted to have sexual intercourse with her. The victim refused and left the dormitory to go to a party. She saw defendant again later that evening in the parking lot of a

State v. Shamsid-Deen

fast-food restaurant. The victim was sitting in a car with her boyfriend when defendant pulled up beside them in his car. Defendant told her to get out of the car because he wanted to talk to her. She went to his car and sat in the passenger seat with her feet outside the car. Defendant called the victim various pejorative names and hit her in the face. She laughed and told him she hoped he enjoyed it because it would never happen again. The two exchanged words and defendant hit her in the face again, then reached in the back seat and got a gun. He told the victim "he would blow [her] f--king head off." Defendant pulled the victim out of the car and "stomped" on her, bruising her legs and bursting her eardrum. After this incident defendant continued to call, leave notes on the victim's car, and attempt to visit her. The victim dropped out of school soon after this and moved in with one of her sisters in another city.

The victim testified that she had been pregnant four times between 1980 and 1983. Each pregnancy was the result of sexual intercourse with defendant, and each pregnancy was terminated by abortion. Defendant arranged and paid for three of the four abortions. The victim paid for the last abortion because she was not on speaking terms with defendant.

The victim's twenty-nine-year-old sister (Sister A)[1] testified that defendant is her father. She testified that the victim told her about the incident with defendant in early August 1983. Sister A testified that she married at age eighteen and left home. Defendant would come to visit her in her apartment while her husband was at work. If she refused to open the door, he would keep knocking until she became embarrassed and let him in. Once inside, defendant physically would force her to have sexual intercourse with him. Sister A testified that it did not take much force because she was so accustomed to having him force her to have intercourse. Her father had been beating her to force her to submit to intercourse since she was nine years old. Defendant stopped visiting her and forcing her to have sex after she threatened to tell her husband. She was pregnant once while in

---

1. In order to avoid further embarrassment to victims or witnesses who have been sexually molested, it is this Court's policy to avoid use of their names. *See State v. Hosey,* 318 N.C. 330, 332 n.1, 348 S.E. 2d 805, 807 n.1 (1986).

junior high school and suffered a miscarriage. She terminated another pregnancy by abortion.

The victim's twenty-seven-year-old sister (Sister B) testified that defendant is her father. She married and left home at age eighteen. Defendant formerly visited her in her apartment during the daytime while her husband was at work. Defendant would tell her to "give him some," then take off her clothes and have intercourse with her. If she resisted, he would grab her by the arm and shove her to the floor. Sister B was afraid of defendant because he had choked her to force her to submit to intercourse in the past. Before Sister B married, defendant pulled a knife on her and told her he would rather see her dead than with somebody else. The last time he came to her apartment she took off her shoe and beat him with it. After that, defendant's overtures ceased.

Sister B testified that the victim told her about the incident in August 1983 shortly after it happened. The victim told Sister B that defendant had a gun with him and had persuaded the victim to go to dinner with him because he said he wanted to reconcile their relationship. Sister B testified that defendant had used a similar ruse with her once, then took her to a motel room and attempted to have intercourse with her.

One of defendant's daughters (Sister C) and one of his sons (Brother A) testified on his behalf. Sister C testified that she attended college in Greensboro during the time the victim was a college student. The sisters saw each other almost daily. Sister C remembered the April 1983 incident because she had been at a sorority banquet that evening. The victim's boyfriend called Sister C from the fast-food restaurant after the altercation, and Sister C went to see the victim. The victim said she and defendant had fought because he wanted to take away her car. The victim said, "I'm going to get him if it's the last thing I do." Sister C saw her father later that evening and he said he tried to take away the car because the victim was driving without insurance. Defendant then took the license plate off the car.

Sister C testified that the victim never told her about the August 1983 incident. She denied knowing that her father came to Greensboro frequently to visit the victim. She denied telling Sister B that she had told defendant he was sick and needed help.

Sister C denied that she had testified in a juvenile court proceeding that she was embarrassed about the family problems coming to light and feared her future career would be affected adversely.

Brother A testified that he knew the victim was pregnant in the summer of 1983. The victim told him that her boyfriend had impregnated her. The victim never told Brother A that defendant raped her in August 1983. Brother A knew about the April 1983 incident but he believed the argument was over defendant taking away the victim's car.

Brother A denied telling Sister B that when he was younger defendant "used to mess with [him], too." He denied telling Sister B, after a related court proceeding, that she should not have told the judge what he had said. He denied that he moved in with Sister A for a while because defendant had been "messing with [him] again." He denied seeing defendant come out of the victim's bedroom at night when they all lived at home and denied saying, "What are you doing in there messing with [the victim]?"

Defendant testified that he had no communication with the victim in August 1983. He had not seen her since the argument in April. He went to see the victim in April to tell her he was taking the car because the insurance had expired. When he found her at the fast-food restaurant and told her he was taking the car, she became angry and cursed. She had been drinking or smoking dope. She slapped defendant and scratched his face, so he hit her one time. The victim refused to give defendant the keys to the car, so he took the license plate.

Defendant next saw the victim in May at Sister C's graduation, where the victim refused to speak to defendant. He did not contact her in August 1983 and did not take her to dinner. Defendant denied having sexual intercourse with the victim in August 1983 or at any time. He denied that he had had sexual relations with "every single one" of his nine children. Defendant denied that he had taken away the car from the victim in April 1983 to punish her for refusing to submit to his sexual advances. He denied arranging for three abortions for the victim and denied that the signatures on the medical records were his. He denied owning a gun recently. He once owned a shotgun but gave it to his brother many years ago. Defendant denied visiting the victim

frequently while she was at college and denied sending her letters, cards, and flowers, except on her birthday. He denied that the signatures on several letters introduced by the State were his.

The State called the victim's college roommate in rebuttal. She testified that defendant visited the victim in Greensboro two or three times a week during the victim's two years of college. Defendant called the victim on the telephone five or six times a day. The victim often refused to talk with defendant; when she did answer the call, the conversation was never pleasant. The roommate testified that she knew nothing about the April 1983 incident outside the fast-food restaurant.

The victim's suitemate from the college dormitory testified that defendant formerly visited the victim in her dormitory room on weekends when the victim's roommate was away. Defendant and the victim would go into the victim's room and lock the door.

The State recalled Sister B. She testified that Sister C said she had talked to defendant and told him incest was a taboo. Sister C told Sister B she had made defendant leave the victim's bedroom at night when they all lived at home. Sister B also testified that she had talked with Brother A about the family situation. After another court proceeding, he told her she should not have repeated what he told her in confidence. Sister B identified her father's signature on the letter introduced by the State.

Defendant first argues that the trial court erred by allowing the victim and her sisters to testify regarding defendant's prior acts of sexual misconduct with them. Defendant brings forward fourteen exceptions to the testimony of the victim relating to her history of sexual abuse at the hands of defendant and defendant's assault on her in April 1983. Before the victim was allowed to testify regarding defendant's prior acts of misconduct, the trial court conducted a lengthy voir dire examination to determine the proposed contents of the victim's testimony. At the conclusion of the hearing defense counsel stated, "I believe this testimony as it relates to the threats and the use of weapons is competent. This is the first time I've heard this testimony, and I think you would have to rule the evidence to be competent." Immediately thereafter, defendant lodged one general objection when the prosecutor asked the victim, "When was the first time your father ever

put his penis inside your vagina?" The trial court overruled the objection, and defendant did not specify his grounds for objection. Defendant did not object to the victim's testimony on which the remaining thirteen exceptions are based.

"A general objection, if overruled, is ordinarily no good, unless, on the face of the evidence, there is no purpose whatever for which it could have been admissible." 1 Brandis on North Carolina Evidence § 27, at 136 (3d ed. 1988); *see State v. Ward*, 301 N.C. 469, 477, 272 S.E. 2d 84, 89 (1980). Defendant has not demonstrated that the testimony was inadmissible for any purpose. While evidence of other crimes or acts committed by a criminal defendant is generally inadmissible in a prosecution for an independent offense, evidence of a prior act may be introduced "when it tends to establish a common plan or scheme embracing the commission of a series of crimes so related to each other that proof of one or more tends to prove the crime charged and to connect the accused with its commission." *State v. McClain*, 240 N.C. 171, 176, 81 S.E. 2d 364, 367 (1954).[2] This rule was later codified in Rule 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (1988).

[1] This Court frequently has held that evidence of prior similar sex offenses committed by the defendant with the prosecuting witness falls within the *McClain* "common scheme" exception. *State v. Hobson*, 310 N.C. 555, 561, 313 S.E. 2d 546, 549 (1984). Defendant contends, however, that the prior instances of sexual misconduct were too remote in time to fall within this exception. *State v. Jones*, 322 N.C. 585, 369 S.E. 2d 822 (1988) (evidence of

---

2. For actions and proceedings commenced after 1 July 1984, the admissibility of evidence of crimes for which the defendant is not on trial is governed by Rule 404(b) of the North Carolina Rules of Evidence. *See* N.C.G.S. § 8C-1 editor's note; 1983 N.C. Sess. Laws ch. 701, § 3. The present case was tried prior to the effective date of the Rules of Evidence.

seven-year-old assaults on unrelated victim too remote under Rule 404(b) ); *State v. Shane*, 304 N.C. 643, 285 S.E. 2d 813 (1982) (pre-Rules case awarding new trial on basis of improperly admitted evidence of remote prior sexual misconduct). We disagree. The victim testified that defendant's sexual attentions toward her began when she was nine and continued until the date of the crime specified in the indictment. The prior acts formed a distinct pattern of forced sexual intercourse over an eleven-year period, saving only the hiatus from April 1983 to August 1983. While a lapse of time between instances of sexual misconduct slowly erodes the commonality between acts and makes the probability of an ongoing plan more tenuous, *Jones*, 322 N.C. at 590, 369 S.E. 2d at 824, the continuous execution of similar acts throughout a period of time has the opposite effect. When similar acts have been performed continuously over a period of years, the passage of time serves to prove, rather than disprove, the existence of a plan. We thus hold that the prior acts were not too remote to be considered as evidence of defendant's common scheme to abuse the victim sexually. *State v. Browder*, 252 N.C. 35, 38, 112 S.E. 2d 728, 730-31 (1960) (first acts and other acts not too remote where acts continuous over period of years).

Even assuming arguendo the inadmissibility of the victim's testimony that she was nine years old the first time defendant had intercourse with her, similar evidence was later admitted without objection. The victim testified without objection that defendant began fondling her at age five, that the first act of intercourse was very painful, and that defendant performed sexual acts upon her once a week when she was between the ages of ten and twelve and daily as she grew older. Any benefit of the prior objection was lost by the failure to renew the objection, and defendant is deemed to have waived his right to assign error to the prior admission of the evidence. *State v. Ramey*, 318 N.C. 457, 462, 349 S.E. 2d 566, 570 (1986); *State v. Gordon*, 316 N.C. 497, 503, 342 S.E. 2d 509, 513 (1986); *State v. Morgan*, 315 N.C. 626, 641, 340 S.E. 2d 84, 94 (1986).

[2] Defendant failed to object at trial to the testimony upon which the remaining thirteen exceptions are based. "Failure to make timely objection or exception at trial waives the right to assert error on appeal, . . . and a party may not, after trial and judgment, comb through the transcript of the proceedings and

randomly insert an exception notation in disregard of the mandates of App. R. 10(b)." *State v. Gardner*, 315 N.C. 444, 447, 340 S.E. 2d 701, 704-05 (1986) (citations omitted). *See* N.C.R. App. P. 10(b)(1); N.C.G.S. § 15A-1446(b) (1988); *State v. Reid*, 322 N.C. 309, 312, 367 S.E. 2d 672, 674 (1988). A defendant need not renew his objection upon presentation of testimony before the jury in order to preserve the question of admissibility for appellate review if he has excepted to an adverse ruling following a voir dire hearing. *State v. Mems*, 281 N.C. 658, 666-67, 190 S.E. 2d 164, 170 (1972). Here, however, defendant did not except to the adverse ruling on voir dire, but instead admitted that the evidence was "competent."

Defendant has not argued that admission of the victim's testimony amounted to plain error, and such an argument could not prevail in light of defense counsel's statement following voir dire examination of the victim that the evidence was competent. To hold otherwise would invite the creation of reversible error by counsel during trial.

[3] Defendant also assigns error to the admission of the sisters' testimony that defendant had forced them to have sexual intercourse with him in the past. Defendant contends that any alleged sexual misconduct by him toward Sister A or Sister B was too remote in time from the August 1983 rape to be admitted properly for the purpose of showing a systematic plan. Evidence of prior acts of sexual misconduct may be admissible to show defendant's intent, motive, or plan to commit the crime charged. *State v. Boyd*, 321 N.C. 574, 577, 364 S.E. 2d 118, 119 (1988) (evidence that defendant molested his wife's eight-year-old female cousin admissible in trial for rape of defendant's thirteen-year-old stepdaughter); *State v. DeLeonardo*, 315 N.C. 762, 769-71, 340 S.E. 2d 350, 356-57 (1986) (evidence relating to defendant's sexual activity with his three-year-old daughter admissible in trial for sexual offense against defendant's minor sons). In *DeLeonardo*, we specifically stated that the challenged evidence would have been admissible under the *McClain* common scheme exception, as well as under Rule 404(b). *DeLeonardo*, 315 N.C. at 770, 340 S.E. 2d at 356.

"[T]he facts of each case ultimately decide whether a defendant's previous commission of a sexual misdeed is peculiarly perti-

nent in his prosecution for another independent sexual crime."
*Shane*, 304 N.C. at 654, 285 S.E. 2d at 820. The facts here
demonstrate sufficient similarity between the prior acts and the
crime specified in the indictment to justify the trial court's admis-
sion of evidence of defendant's prior sexual misconduct. The evi-
dence revealed defendant's pattern of forcing his daughters to
submit to intercourse as they reached puberty and continuing to
assault them, using whatever force necessary, into their adult-
hood and after they had left home. As in *Boyd* and *DeLeonardo*,
family members were allowed to testify about their own sexual
abuse by a defendant to show a male relative's systematic plan to
sexually exploit the members of his family. As stated in *State v.
Goforth*, 59 N.C. App. 504, 297 S.E. 2d 128 (1982), *rev'd and
remanded for resentencing on other grounds*, 307 N.C. 699, 307
S.E. 2d 162 (1983), evidence of defendant's prior misconduct with
other family members properly was admitted to show that "de-
fendant systematically engaged in nonconsensual sexual relations
with his [daughters] as they matured physically, a pattern of con-
duct embracing the offense charged." *Id.* at 506, 297 S.E. 2d at
129. *See also Gordon*, 316 N.C. at 505, 342 S.E. 2d at 513 (evidence
that defendant had intercourse with three-year-old daughter ad-
missible to show common scheme in trial for rape of six-year-old
daughter).

Defendant argues that the admission of evidence of his prior
acts of misconduct spanning a twenty-year period was reversible
error because the evidence was so prejudicial that the jury must
have been predisposed not to believe any evidence presented on
defendant's behalf. We disagree. While the evidence was prejudi-
cial to the defendant, it was not unfairly prejudicial. Defendant
cross-examined all the witnesses against him and the court gave a
proper limiting instruction to the jury regarding the evidence of
defendant's prior acts of misconduct. *Id.* at 505, 342 S.E. 2d at
514.

[4] Defendant argues that the trial court's admission of evidence
regarding his prior acts of misconduct violates his state and fed-
eral constitutional due process rights. These constitutional claims
were not raised at trial or in the assignments of error and thus
will not be considered on appeal. *State v. Benson*, 323 N.C. 318,
321-22, 372 S.E. 2d 517, 519 (1988); *State v. Hunter*, 305 N.C. 106,
112, 286 S.E. 2d 535, 539 (1982). Further, these arguments are

essentially a restatement of the rationale for the general rule excluding evidence of defendant's prior acts of misconduct. *See McClain*, 240 N.C. at 173-74, 81 S.E. 2d at 365-66. As discussed above, the evidence in question was admitted properly under a well-established exception to the general rule of exclusion.

Defendant next argues that the trial court erred by permitting the prosecutor to cross-examine defendant regarding his religious beliefs. Defendant assigns error to the following line of questioning:

Q. It's true isn't it, Mr. Shamsid-Deen, in the black Muslim religion, the father of the family is a very dominant and very powerful figure?

[objection overruled]

A. No, that's not true.

Q. It's true, isn't it, Mr. Shamsid-Deen, that in the black Muslim family the father's word is law, isn't that correct?

A. No, that is not correct.

Q. And that when the father is not at home the oldest male son rules the household, isn't that true?

A. No, that's not true.

Q. Is it true, Mr. Shamsid-Deen, that in a black Muslim household that the females are expected to be and are upon pain of punishment very submissive?

A. You seem to have a pretty good knowledge of something you've read, but we didn't practice it that way.

Q. Premarital sex is forbidden in the black Muslim religion, isn't that true, Mr. Shamsid-Deen?

A. You keep saying black Muslims. There's no such thing as black Muslims. We are Muslims, but we are not black Muslims. We are members of the Islamic faith, who are Muslims nationwide. There's no such thing as a black Muslim.

Q. Thank you, sir. Is premarital sex forbidden in your religion, Mr. Shamsid-Deen?

A. I believe it is forbidden in any religion.

Q. Is it forbidden in yours?

A. In the religion we practice, yes, morally, yes.

Q. And that is the way you have raised your daughters and your sons?

A. That is the way we were taught.

Q. And your children were taught that they were not to have sex with anyone before they were married, is that true? Except for their own father, is that true, Mr. Shamsid-Deen?

[objection overruled]

A. Except for their husband when they are married.

Q. Mr. Shamsid-Deen, did you have a sword in your home when your children were small that you used to play with while you held your children on your lap?

A. No, I don't recall that. No.

Q. Do you recall telling your daughters about the sword and that anyone who did not tell the truth and did not do what their father told them to would have their heads cut off with it?

A. No, that's a lie.

We note initially that defendant opened the door to this line of questioning. In cross-examining the victim, defendant elicited from her that she and her family were Muslims. Moreover, defendant objected at trial to only two of the questions to which he now assigns error. The remaining questions will not be considered as the basis for reversible error on appeal because of defendant's failure to make timely objection. *Gardner*, 315 N.C. at 447, 340 S.E. 2d at 704-05.

[5] Defendant asserts that allowing the questions to be asked, even in the absence of objection, amounted to fundamental error. We perceive no fundamental or plain error because we cannot conclude that the jury probably would have reached a different verdict absent the questions regarding defendant's religion. *Reid*, 322 N.C. at 313, 367 S.E. 2d at 674; *State v. Odom*, 307 N.C. 655, 661, 300 S.E. 2d 375, 378-79 (1983).

**[6]** Regarding the first question to which defendant objected, *i.e.*, whether the father in a Muslim family is a very powerful figure, defendant answered in the negative. Essentially the same question was asked without objection immediately thereafter. Therefore, any benefit of the prior objection was lost. *Ramey*, 318 N.C. at 462, 349 S.E. 2d at 570; *Gordon*, 316 N.C. at 503, 342 S.E. 2d at 513; *Morgan*, 315 N.C. at 641, 340 S.E. 2d at 94.

**[7]** The second question to which defendant objected was whether the children were taught not to have sex with anyone but their father. Defendant answered in the negative. This question can in no way be construed as an insult to the Islamic religion, as defendant argues, because the context makes clear that Muslim doctrine forbids premarital sex.

*State v. Kimbrell*, 320 N.C. 762, 360 S.E. 2d 691 (1987), cited by defendant, is readily distinguishable. There, the trial court allowed the prosecutor, over defendant's repeated objections, to cross-examine the defendant regarding his "devil-worshipping" activities. The satanic activities at issue were irrelevant to the crime charged, and evidence of them was introduced to arouse the passion and prejudice of the jury. Here, by contrast, the State's apparent motive for questioning defendant about his religion was to show how he was able to intimidate his daughters over such a long period of time, continuing even after they left home. In this context, the overruling of defendant's general objection was proper.

Defendant's remaining exceptions under this assignment of error pertain only to questions to which defendant objected at trial. The trial court sustained defendant's objections, and defendant did not answer the questions. Therefore, no prejudice to defendant resulted. The assignment of error is overruled.

Defendant received a fair trial free from prejudicial error.

No error.

Justice MITCHELL concurring.

I concur in the decision of the Court and write separately only to emphasize that, since the defendant's trial commenced prior to 1 July 1984, this case has not been decided under the

North Carolina Rules of Evidence. Therefore, questions concerning the admissibility of evidence of other offenses by the defendant are controlled in the present case by *State v. McClain*, 240 N.C. 171, 81 S.E. 2d 364 (1954) and cases decided thereunder, not by N.C.G.S. § 8C-1, Rule 404(b).

Under our new Rule 404(b), it is not the case — as we *sometimes* stated under *McClain* — that evidence of other offenses falls under a "general rule of exclusion" subject to certain "exceptions." *Cf.* 1 Brandis on North Carolina Evidence § 91 (3d ed. 1988) (reviewing the erratic nature of our methods of stating the applicable rule under *McClain* in prior cases and, at times, in the same opinion). It is clear now that, "as a careful reading of Rule 404(b) clearly shows, evidence of other offenses is *admissible* so long as it is *relevant to any fact or issue* other than the character of the accused." *State v. Weaver*, 318 N.C. 400, 403, 348 S.E. 2d 791, 793 (1986) (quoting 1 Brandis on North Carolina Evidence § 91 (2d rev. ed. 1982)) (emphasis added). " 'Relevant evidence' means evidence having any tendency to make the existence of *any fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1988) (emphasis added).

> Thus, even though evidence may tend to show other crimes, wrongs, or acts by the defendant and his propensity to commit them, it is admissible under Rule 404(b) so long as it also "is relevant for some purpose *other than* to show that defendant has the propensity for the type of conduct for which he is being tried."

*State v. Bagley*, 321 N.C. 201, 206, 362 S.E. 2d 244, 247 (1987) (quoting *State v. Morgan*, 315 N.C. 626, 637, 340 S.E. 2d 84, 91 (1986)).

These recent cases decided under Rule 404(b) and others relying upon them state a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged. I recognize that, in stating the rule under *McClain*, our "different methods of statement (at times appearing in the same opinion) produced no clear disparity in results." 1 Brandis on North Carolina Evidence,

§ 91 (3d ed. 1988). However, I think it will be helpful to the Bar and only proper for this Court to continue along one clear course in stating the general rule to be applied under our new Rule 404(b), rather than adopting an erratic course as was the case under *McClain*. I believe that our recent cases support such a clear course under Rule 404(b) in the form of the general rule of inclusion I have set forth, and I hope we will not deviate from that course in future cases.

Justice MARTIN joins in this concurring opinion.