**STATE v. GARCIA**

[228 N.C. App. 89 (2013)]

–––––––––––––––––

STATE OF NORTH CAROLINA
v.
VICTOR ALFONSO CRUZ GARCIA, Defendant

No. COA12-972

Filed 18 June 2013

1.  **Evidence—interrogation transcript—detective's questions— relevant—not improper opinion testimony**

    The trial court did not commit plain error in a second-degree murder case by admitting the transcript of defendant's interrogation without redacting certain challenged statements. Each of the challenged statements was relevant and did not constitute improper opinion testimony of the credibility of defendant or of the State's witnesses.

2.  **Appeal and Error—preservation of issues—Rule 403 balancing test—plain error**

    Defendant's argument that the trial court committed plain error by allowing into evidence certain statements under Rule 403 was not preserved for appellate review. The balancing test of Rule 403 is reviewed by this Court for abuse of discretion, and the Court does not apply plain error to issues which fall within the realm of the trial court's discretion.

**3.  Evidence—detective's    testimony—relevant—defendant's credibility**

The trial court did not err in a second-degree murder case by overruling defendant's objection to the detective's testimony regarding his interrogation strategy. The detective's strategy was relevant to defendant's credibility at trial.

Appeal by defendant from judgment entered 13 February 2012 by Judge W. Robert Bell in Mecklenburg County Superior Court. Heard in the Court of Appeals 30 January 2013.

*Attorney General Roy Cooper, by Assistant Attorney General Jason T. Campbell, for the State.*

*Duncan B. McCormick for defendant-appellant.*

GEER, Judge.

Defendant Victor Alfonso Cruz Garcia appeals from his conviction of second degree murder. On appeal, defendant primarily argues that the trial court, when admitting the transcript of defendant's interrogation, should have excluded certain statements made by the interrogating detective because, defendant contends, those statements were irrelevant and constituted an improper comment on the credibility of defendant and of the State's witnesses. We hold that the detective's interrogation statements were properly admitted under *State v. Miller,* 197 N.C. App. 78, 676 S.E.2d 546 (2009), and *State v. Castaneda,* ___ N.C. App. ___, 715 S.E.2d 290, *appeal dismissed and disc. review denied,* 365 N.C. 354, 718 S.E.2d 148 (2011).

Facts

The State's evidence tended to show the following facts. As of May 2009, defendant and Jennifer Fuentes had been dating and living together for approximately three months. Prior to dating defendant, Ms. Fuentes had lived with Edgardo Perez. Ms. Fuentes had a young son that Mr. Perez treated as his son, although Mr. Perez may not have been the boy's biological father.

Prior to dating defendant, Ms. Fuentes was a happy person and enjoyed spending time with her cousin, Lidia Noemi Mejia Pineda. The two often laughed, visited each other's homes, and went out together. According to Ms. Pineda, once Ms. Fuentes began dating defendant, Ms.

Fuentes became very quiet and was "not the same person" she had been before. Ms. Fuentes rarely called or visited Ms. Pineda. Although Ms. Fuentes had been a person "that would always make herself up," she stopped doing so while dating defendant. Ms. Fuentes worked and made good money. However, after she started dating defendant, Ms. Fuentes began asking to borrow money from Ms. Pineda.

On 10 May 2009, Ms. Pineda went to the house Ms. Fuentes shared with defendant and asked Ms. Fuentes to go out with Ms. Pineda to celebrate Mother's Day. Ms. Fuentes was very quiet, was not made up, and would not commit to leaving the house. Ms. Fuentes then went into the bedroom with defendant, came back out, and told Ms. Pineda she could not go out. According to another of Ms. Fuentes' cousins, Elder Mejia, who lived with Ms. Fuentes and defendant at the time, defendant locked Ms. Fuentes in their bedroom that evening and refused to let her leave the house.

At one point while Mr. Mejia was living in the house with Ms. Fuentes and defendant, Mr. Mejia asked Ms. Fuentes why she hid all the knives in the house. She replied that it was because defendant was capable of anything. Another time, while defendant and Ms. Fuentes were arguing about jealousy, defendant told Ms. Fuentes, "[I]f I can't have you, then nobody can have you." Ms. Fuentes told Mr. Mejia she was afraid of defendant, and defendant mistreated her.

Sometime in May 2009, defendant beat Ms. Fuentes and threw her to the floor. Mr. Mejia was present and tried to intervene, but he stopped when defendant grabbed his shirt, pointed a black pistol at Mr. Mejia, and warned Mr. Mejia not to call the police or defendant would kill him. Following that incident, Mr. Mejia moved out of the house.

On 30 May 2009, a Saturday evening, Mr. Perez went to Ms. Fuentes' house and, while there, fought with defendant. During the fight, defendant pointed a gun at Ms. Fuentes, just below her neck. The police were called, but defendant ran from the house before they arrived. Mr. Perez remained and was arrested and taken to jail.

Ms. Fuentes and her son stayed with a neighbor, Martha Juarez, that night. Later that night, defendant came to Ms. Juarez' house, knocked on the bedroom window and the door, and asked to speak with Ms. Fuentes. Defendant pushed past Ms. Juarez to try to get into the bedroom with Ms. Fuentes, but Ms. Juarez' husband made defendant leave the house.

Defendant returned to Ms. Juarez' house the next morning, 31 May 2009, and asked to talk with Ms. Fuentes. Ms. Juarez did not let him in

and called her adult daughter, Vicky Soto, to come over. Ms. Fuentes told Ms. Soto she was afraid of defendant and that defendant had a gun and had fought with Mr. Perez. Defendant then returned to Ms. Juarez' house and asked to speak with Ms. Fuentes again. Ms. Soto told defendant that Ms. Fuentes did not want to talk and that she was calling the police. In response, defendant called the police himself.

Two police officers arrived, and Ms. Fuentes and Ms. Soto spoke with them in the front yard. The officers asked defendant to wait away from Ms. Fuentes because she did not want to speak to them with him present. Ms. Fuentes told the officers that she did not want to go back to the house, that she wanted defendant out of the house, and that the police should have arrested defendant and not Mr. Perez the previous night because defendant had the gun.

Ms. Soto then translated for defendant, who only speaks Spanish, so he could talk with the police. Defendant asked the officers to make Ms. Fuentes return home, and they responded that they could not do so. Defendant told the officers he did not have a gun and that he would not leave the house because it was his home. The officers then told Ms. Fuentes that they could not make defendant leave until she obtained a legal order requiring him to leave the house. They explained to her that the office where she could request the order was closed on Sundays.

Later that morning, Ms. Pineda met Ms. Fuentes as she was leaving the neighbor's house. Ms. Fuentes was sad, worried, and afraid of what defendant would do if Ms. Fuentes helped bail Mr. Perez out of jail. Nevertheless, Ms. Fuentes and Ms. Pineda went to the courthouse that day to learn with what crimes Mr. Perez had been charged and then tried to locate an attorney who could help Mr. Perez get out of jail. They encountered defendant, and defendant told Ms. Fuentes to "not be going trying to get [Mr. Perez] out of jail because she would regret it." Defendant told Ms. Pineda she should not get involved, and she "didn't know what he was capable of."

Also on that Sunday, Ms. Fuentes and Ms. Pineda went to the police department so that Ms. Fuentes could attempt to obtain a protective order against defendant and thereby have defendant removed from the house. That same day, Ms. Fuentes told Mr. Mejia that she wanted to separate from defendant and that defendant was planning on killing somebody with his pistol, but she did not know if would be her or Mr. Perez.

On Sunday night, Ms. Fuentes told Ms. Pineda that Ms. Fuentes "had to go back to her house," but she asked Ms. Pineda to allow her son to

stay at Ms. Pineda's house for the night. Ms. Fuentes also told Ms. Pineda that she had assured defendant she was not trying to help Mr. Perez get out of jail, and she warned Ms. Pineda not to tell defendant anything to the contrary.

On Monday, 1 June 2009, Ms. Fuentes picked up Ms. Pineda in the morning and the two again searched for an attorney to help Mr. Perez get out of jail, ultimately finding one and paying him $800.00. That sum did not cover Mr. Perez' bail money. Ms. Fuentes repeatedly told Ms. Pineda she was very afraid of what would happen if defendant found out what they were doing. At approximately 3:30 p.m., Ms. Fuentes went back to her house to pick up clothes for herself and her son so that they could move in with Ms. Pineda. Ms. Pineda offered to go with Ms. Fuentes, but Ms. Fuentes preferred to go alone because she was afraid something might happen to Ms. Pineda.

Ms. Pineda called Ms. Fuentes twice after she left, asking if Ms. Fuentes was okay and if she would return soon. Each time Ms. Fuentes gave unusually brief answers, saying that she was okay without elaboration. Ms. Fuentes failed to pick up her son from the baby-sitter that evening. At approximately 6:00 p.m., Ms. Fuentes called another cousin, Christine Mejia. Ms. Fuentes sounded nervous and asked Ms. Mejia if she could borrow $500.00. Ms. Mejia said she could not lend the money, and the call suddenly dropped. Ms. Mejia tried to call Ms. Fuentes back, but there was no answer. Five minutes later, Ms. Fuentes called Ms. Mejia back, and, during the call, Ms. Mejia heard a male voice in the background, Ms. Fuentes spoke something unintelligible to the male, and the call ended abruptly.

At some point that evening, defendant went to the house of Ms. Juarez, the neighbor. He asked Ms. Juarez' husband if he could use the phone to try to get a key to his house because he was locked out and was looking for Ms. Fuentes.

When Ms. Fuentes had still not returned to Ms. Pineda's house by 7:30 p.m., Ms. Pineda went to Ms. Fuentes' house and found it locked. After nobody answered the door, Ms. Pineda went to Ms. Juarez' house and, together with Ms. Juarez and Ms. Juarez' husband, obtained a key to Ms. Fuentes' house. Ms. Juarez' husband entered the house and found Ms. Fuentes' body. Ms. Pineda immediately called the police.

The responding officers found Ms. Fuentes dead on the bedroom floor with a knife stuck in her back and a black semi-automatic handgun under her armpit. The gun defendant had threatened Mr. Mejia with

was also a black handgun with a magazine. Ms. Fuentes had 16 cut or stab wounds from a knife, nine of which would have been independently fatal. Among other places, Ms. Fuentes had been stabbed in the eye, the neck, the chest, five times in the right side, and three times in the back. A knife wound to Ms. Fuentes' forearm was a defensive wound; wounds to her hands may also have been defensive wounds.

An officer responding to the scene spotted defendant walking on a nearby street. The officer stopped and talked to defendant, and defendant told him that he was walking home and lived at the address to which the officer was responding. The two walked to defendant's address, and, upon arriving, defendant asked the officer what was going on and repeatedly asked if his "lady" was okay. After defendant arrived on the scene, a responding firefighter translated for defendant, and defendant told the officers that he had been out all evening looking for apartments. The firefighter found it strange that defendant was calm and "just stood there watching like he was watching a commercial on TV." During this time, an officer identified the tread of defendant's shoes as matching bloody shoeprints inside the house.

Detective David Osorio of the Charlotte-Mecklenburg Police Department responded to the scene, spoke with defendant, and noticed that defendant had drops and smears of blood on the top of his shoes. That night, Detective Osorio interviewed several witnesses and then interviewed defendant. Throughout his interview, defendant maintained he had not been in the house that evening, he had been out looking for apartments, and he did not know what happened to Ms. Fuentes. Despite extensive questioning by Detective Osorio as to why, among other things, defendant's shoes were bloody and there were bloody footprints matching the tread of defendant's shoes in the house, defendant repeatedly denied knowledge of the killing. Defendant stated that he only learned of the killing when he arrived at the scene, Ms. Mejia told him "they had killed [Ms. Fuentes]," and then Ms. Mejia began accusing defendant of killing Ms. Fuentes. Defendant ultimately told Detective Osorio that he would "take this explanation to the graveyard . . . [b]ecause one has to tell the truth."

On 15 June 2009, defendant was indicted for first degree murder. At trial, defendant testified in his own defense to the following. According to defendant, defendant's fight on Saturday night had been with Mr. Perez only, and defendant had never threatened Ms. Fuentes. During the fight, defendant took a gun from Ms. Fuentes' brother and fired two shots into the ceiling. In the evening on Sunday, 31 May 2009, Ms. Fuentes returned home, defendant apologized, and she forgave him.

On the next evening, 1 June 2009, Ms. Fuentes returned home from work, was agitated, and told defendant that the landlord was kicking them out of the house immediately. She began hitting defendant, still upset that Mr. Perez had been arrested. Defendant attempted to call 911, but Ms. Fuentes grabbed for the phone and, during a struggle, the phone broke. Ms. Fuentes then grabbed a knife and began motioning that she would stab defendant. After Ms. Fuentes backed defendant into a corner, defendant struggled with her and took the knife. Ms. Fuentes said, "I'm going to kill you" and pointed a pistol at defendant. Defendant then stabbed Ms. Fuentes in self-defense.

Defendant claimed he was afraid, left the house, and wandered around the neighborhood. He did not request help from the neighbors and did not consider helping Ms. Fuentes. Although defendant knew how to call 911, he did not do so because he did not want to interact with the police. When a police officer on the street spoke to him, defendant decided to deny killing Ms. Fuentes. Defendant was not aware that he could claim self-defense, and he believed that if he told the truth, he would be placed in jail. Defendant acknowledged that during his interview with Detective Osorio, defendant had consistently and deliberately concealed the truth and denied stabbing Ms. Fuentes in an effort to avoid going to jail.

The jury found defendant guilty of second degree murder, and the trial court sentenced defendant to a presumptive-range term of 135 to 171 months imprisonment. Defendant timely appealed to this Court.

I

[1] Defendant filed a motion in limine to redact portions of the transcript of his interrogation on the night of the killing. The trial court granted the motion in part and denied it in part. Defendant argues on appeal that the trial court erred by "failing to exclude evidence relating to statements [of the detective] that did not elicit substantive responses or cause [defendant] to change his story during the interview." Defendant groups the challenged statements into three categories: (1) Detective Osorio's "assertions that [defendant] was not being truthful"; (2) Detective Osorio's "statements that [defendant] was going to look like a monster and a murderer if he did not give an explanation for the killing"; and (3) Detective Osorio's "assertions that [Ms. Fuentes] feared [defendant] and the detective's speculation about what happened."

Defendant concedes that he did not, however, object to admission of any of the challenged statements when the interrogation transcript was admitted into evidence and published to the jury. Defendant also failed

to object when the interrogating detective testified, using the transcript, to the substance of many of the challenged statements. Because defendant failed to renew his objections at trial, defendant did not preserve these issues for appellate review. *State v. Crandell*, 208 N.C. App. 227, 235, 702 S.E.2d 352, 358 (2010) ("A motion *in limine* does not preserve a question for appellate review in the absence of the renewal of the objection at trial."), *disc. review denied*, 365 N.C. 194, 710 S.E.2d 34 (2011).

Defendant argues, however, that the trial court committed plain error in admitting the transcript without redacting the challenged statements.

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice -- that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations and quotation marks omitted).

Defendant first argues that none of the challenged statements by Detective Osorio were relevant. " 'Relevant evidence' " is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.R. Evid. 401. " 'In order to be relevant, . . . evidence need not bear directly on the question in issue if it is helpful to understand the conduct of the parties, their motives, or if it reasonably allows the jury to draw an inference as to a disputed fact.' " *Miller*, 197 N.C. App. at 86, 676 S.E.2d at 551 (quoting *State v. Roper*, 328 N.C. 337, 356, 402 S.E.2d 600, 611 (1991)). " '[E]ven though a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal.' " *Id.* at 86-87, 676 S.E.2d at 552 (quoting *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991)).

Defendant concedes that his responses during the interrogation -- which were inconsistent with his trial testimony -- were relevant and

admissible. *See State v. Workman*, 344 N.C. 482, 504, 476 S.E.2d 301, 313 (1996) (" 'Inconsistent prior statements are admissible for the purpose of shedding light on a witness's credibility,' and when the 'prior statement relates to material facts in the witness's testimony, extrinsic evidence may be used to prove the prior inconsistent statement.' " (internal citation omitted) (quoting *State v. Whitley*, 311 N.C. 656, 663, 319 S.E.2d 584, 589 (1984))). Defendant argues, however, that the challenged statements by the detective were not relevant.

Detective Osorio's statements at issue included statements questioning defendant's credibility such as (1) telling defendant to stop insulting the detective's intelligence; (2) calling defendant a "fool" and saying defendant was acting like an "idiot"; and (3) describing defendant's story as "stupid," "disgusting," "shit and . . . pure lies," and "a lie."

Defendant also points to a second group of statements (1) urging defendant to explain the killing so defendant did not appear to be a person "that doesn't feel sorry or regret at all" and so defendant would not look like "a criminal" or "a person that has killed another human being without . . . forgiveness"; (2) claiming that defendant's responses to the questions were making him look like "a monster" and "a murderer"; (3) suggesting that if defendant explained the killing, the detective could tell the prosecutor that defendant told the detective he was not a murderer and gave a reason for the killing; (4) warning that defendant was going to go to jail for the rest of his life if he persisted in not truthfully explaining what happened; and (5) suggesting that if the detective killed his wife or girlfriend, he would give an explanation for his actions so he would not appear to be a monster or a murderer.

The third category of statements included comments (1) that defendant had threatened Ms. Fuentes; (2) that Ms. Fuentes had been calling "everybody" and telling them she feared defendant and she did not want to remain in the house with him; (3) that defendant had threatened Ms. Fuentes' cousin; (4) that defendant needed to explain what happened; (5) that something happened to cause defendant to get angry; and (6) that defendant surprised Ms. Fuentes when she was making a phone call to a cousin and trying to raise money for Mr. Perez' bail.

In *Miller*, the defendant challenged the relevancy of certain statements made by two detectives to the defendant during interrogation in which the detectives referred to "statements purportedly made by nontestifying others, including [the defendant's] co-defendants and his sisters." 197 N.C. App. at 85, 676 S.E.2d at 551. The Court held that the detectives' statements were relevant, reasoning:

The questions and their answers were relevant to facts under dispute. In addition, here, the questions gave context to defendant's responses. . . . [D]uring the course of questioning, defendant eventually conceded to the truth of many of the statements relayed to him via the detectives' questions. *The circumstances under which these concessions were made were relevant to understanding the concessions themselves and therefore to the subject matter of the case.* At other times, after being confronted with the purported statements of others via the detectives' questions, defendant changed his story substantially. In these instances, *the questions were also relevant to explain and provide context to defendant's subsequent conduct of changing his story.*

*Id.* at 87, 676 S.E.2d at 552 (emphasis added).

Defendant's arguments appear to be based upon the premise that, under *Miller*, *each* of the challenged interrogation statements must, independently from the others, have elicited or provided the specific context for a specific relevant response in order to be admissible. *Miller* does not require such a narrow reading. *See id.* at 86, 87, 676 S.E.2d at 551, 552 (analyzing "eight specific portions" of detectives' questions as a group and explaining questions were relevant to give context to defendant's responses because, "during the course of questioning, defendant eventually conceded to the truth of many of the statements relayed to him via the detectives' questions" and "circumstances under which these concessions were made were relevant to understanding the concessions themselves and therefore to the subject matter of the case").

Further, defendant reads *Miller* as allowing admission of an interrogator's statements as providing "context" only if they caused the defendant to concede the truth or change his story. Again, we believe that *Miller* does not limit "context" to those two situations. Rather, whether an interrogator's remarks provide relevant "context" for a defendant's responses depends on the facts of each case.

At the outset of the interrogation in this case, defendant denied having any knowledge of Ms. Fuentes' killing and denied being in the home during the relevant time. Detective Osorio then began making the challenged statements, putting increasing pressure on defendant to tell the truth and to provide an explanation for why defendant killed Ms. Fuentes. However, even when faced with Detective Osorio's aggressive statements providing defendant with strong reasons to come forward

with his self-defense claim, defendant repeatedly and emphatically asserted he was telling the truth when he said he knew nothing about the murder. For example, after Detective Osorio had made many of the challenged statements, defendant said, "Well, I'll take this explanation to the graveyard, this one. Because one has to tell the truth, what I'm telling is the truth . . . ." Similarly, at the end of the interview, after Detective Osorio had made all but one of the challenged statements, defendant said, "I only know to tell you what I know, the truth."

Thus, defendant steadfastly denied any involvement in the killing during his interrogation, but, at trial, admitted killing Ms. Fuentes (although claiming self-defense) and admitted consciously and purposefully lying during the interrogation. Defendant's credibility was a key issue for the jury to decide.

The fact that defendant was willing to repeatedly lie, in spite of Detective Osorio's pressuring interrogation techniques, was highly probative of defendant's credibility. Here, the relevant "context" provided by Detective Osorio's statements is that the defendant's admitted lies that he knew nothing about the murder were made over and over despite increasing pressure by Detective Osorio. Detective Osorio's statements provided "context" because they showed that defendant's responses during the interrogation were not merely prior inconsistent statements.

Defendant's resistance to coming forward with his explanation for the killing when under significant pressure and given incentives to do so, as well as his ability to persist in an admitted lie despite the pressure, was relevant to the credibility of defendant's testimony at trial, including while under cross-examination. The aggregate of Detective Osorio's statements, the type of statements, and defendant's consistent stance in response to those statements that he was telling the truth made the challenged statements relevant in this case.

Defendant alternatively argues that Detective Osorio's statements that defendant was lying constituted improper opinion testimony on defendant's credibility and that Detective Osorio's statements that Ms. Fuentes feared defendant and his speculation about what happened constituted improper opinion testimony on the credibility of defendant and the State's witnesses. In support of his arguments, defendant asserts that he testified at trial that he never threatened Ms. Fuentes or her cousin, that the evidence that Ms. Fuentes wanted to separate from defendant was in conflict, and that the jury's assessment of the credibility of defendant and the State's witnesses on these matters was critical to the issue of self-defense.

In *Castaneda*, ___ N.C. App. at ___, 715 S.E.2d at 294, the defendant argued that an interrogating officer's statements to the defendant that the defendant was lying constituted inadmissible opinion evidence on the veracity of the defendant's pretrial statement and, ultimately, his trial testimony. The *Castaneda* defendant specifically challenged the admissibility of the detective's interrogation statements that the defendant's story was a " 'lie,' " " 'bullshit,' " and "like 'the shit you see in the movies.' " *Id.* at ___, 715 S.E.2d at 294. The defendant contended that, because "the issue of defendant's credibility was 'for the jury and the jury alone,' the trial court erred in admitting th[e] evidence." *Id.* at ___, 715 S.E.2d at 294.

The Court in *Castaneda* observed that " '[i]t is fundamental to a fair trial that the credibility of the witnesses be determined by the jury' and that testimony 'to the effect that a witness is credible, believable, or truthful is inadmissible.' " *Id.* at ___, 715 S.E.2d at 294 (quoting *State v. Hannon*, 118 N.C. App. 448, 451, 455 S.E.2d 494, 496 (1995)). However, the Court pointed out that the defendant shifted his story and made inculpatory statements in response to the detective's interrogation statements challenging his story. *Id.* at ___, 715 S.E.2d at 295. Accordingly, this Court held:

> Because [the detective's] statements were part of an interrogation technique designed to show defendant that the detectives were aware of the holes and discrepancies in his story and were not made for the purpose of expressing an opinion as to defendant's credibility or veracity at trial, the trial court properly admitted the evidence.

*Id.* at ___, 715 S.E.2d at 295.

The Court in *Castaneda* cautioned, however, that "[i]nterrogators' comments reflecting on the suspect's truthfulness are not . . . always admissible." *Id.* at ___, 715 S.E.2d at 295. In this respect, the Court quoted approvingly the Idaho Court of Appeals:

> "A suspect's answers to police questioning are only admissible to the extent that they are relevant. Thus, an interrogator's comments that he or she believes the suspect is lying are only admissible to the extent that they provide context to a relevant answer by the suspect. Otherwise, interrogator comments that result in an irrelevant answer should be redacted."

*Id.* at ___, 715 S.E.2d at 295 (quoting *State v. Cordova*, 137 Idaho 635, 641, 51 P.3d 449, 455 (Idaho Ct. App. 2002)).

In this case, Detective Osorio's comments that defendant was lying expressed an opinion regarding defendant's credibility during the interrogation only. Yet, defendant acknowledged at trial that Detective Osorio was correct when he accused defendant of lying in the interrogation. The jury was not, therefore, required to decide the credibility of defendant's responses during the interrogation.

Even if the detective's interrogation technique could be viewed as an expression of an opinion, it did not invade the province of the jury in this case. Instead, the detective's comments were "part of an interrogation technique designed to show defendant that the detective[] w[as] aware of the holes and discrepancies in his story." *Id.* at ___, 715 S.E.2d at 295. Further, Detective Osorio was also using a strategy designed to give defendant an incentive and opportunity to provide an explanation for the killing. Despite the use of those interrogation techniques, defendant persisted in denying any knowledge of the killing and never mentioned self-defense. Under these circumstances, the challenged statements were properly admitted as a whole, because they provided the context to relevant answers by defendant that directly related to the credibility of defendant's claim of self-defense made for the first time at trial.

In sum, because each of the challenged statements put additional pressure on defendant to admit his now undisputed involvement in the killing, and because defendant steadfastly maintained he was telling the truth throughout the interrogation when denying involvement, each statement provided context to and, in part, elicited defendant's prior inconsistent statement that he did not kill Ms. Fuentes. Each of the challenged statements was, therefore, relevant and did not constitute improper opinion testimony on the credibility of defendant or of the State's witnesses.

II

[2] Defendant further argues that Detective Osorio's interrogation statements that defendant was going to look like a monster and a murderer if he did not give an explanation for the killing were erroneously admitted because, under Rule 403 of the North Carolina Rules of Evidence, any probative value was substantially outweighed by both the danger of unfair prejudice and confusion of the issues presented to the jury. Defendant concedes he did not object to admission of these statements at trial and, therefore, argues admission of the statements was plain error.

Our courts have held, however, that "[t]he balancing test of Rule 403 is reviewed by this court for abuse of discretion, and we do not apply plain error 'to issues which fall within the realm of the trial court's

discretion.' " *State v. Cunningham*, 188 N.C. App. 832, 837, 656 S.E.2d 697, 700 (2008) (quoting *State v. Steen*, 352 N.C. 227, 256, 536 S.E.2d 1, 18 (2000)). Because the issue was not properly preserved for appeal, we do not address it.

III

**[3]** Finally, defendant contends that the trial court erred by overruling his objection to Detective Osorio's trial testimony that when he interviews suspects his "strategy" is "to give them an opportunity to describe what happened," because "[p]eople in general don't normally kill other people." Specifically, the objection occurred in the following context:

> Q. Did you make it clear to him, Detective Osorio, that you were giving him the opportunity to give an explanation for what had happened on June the 1st?
>
> A. I did. You know, when I do interviews with suspects, you know, I always, you know, my strategy is trying to allow them to give -- to give them an opportunity to describe what happened. People in general don't normally kill other people. Things happen that --
>
> [DEFENSE COUNSEL]: Objection, Your Honor.
>
> THE COURT: Overruled.

Defendant contends that the testimony regarding Detective Osorio's strategy was not relevant to any issue in the case.

Because defendant made only a general objection at trial to this testimony, he argues that it amounted to plain error. *See State v. Shamsid-Deen*, 324 N.C. 437, 444, 379 S.E.2d 842, 846 (1989) (" 'A general objection, if overruled, is ordinarily no good, unless, on the face of the evidence, there is no purpose whatever for which it could have been admissible.' " (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 27, at 136 (3d ed. 1988))).

Immediately after the trial court overruled defendant's objection, Detective Osorio continued to testify and describe the interrogation, without objection, as follows:

> A. Things happen that lead up to a certain situation or people snap, and that was what I was trying to express to [defendant]. That I believed that something happened that led up to this particular incident.

. . . .

> I gave him numerous opportunities to be upfront with me and describe, you know, what it was that led up to this situation. *And he just stuck to his guns and said he didn't know; he wasn't there.*

(Emphasis added.) Thus, despite Detective Osorio's interrogation techniques, defendant maintained his later-recanted story.

Defendant's responses were relevant as prior inconsistent statements to impeach his trial testimony. Detective Osorio's interrogation techniques pressured defendant to admit his involvement in the killing during the interrogation and gave defendant an incentive and reason to come forward with his claim of self-defense. Because Detective Osorio's interrogation strategy was designed to encourage a defendant to provide any explanation for a killing that he had, and defendant, despite that encouragement, "stuck to his guns," Detective Osorio's strategy was relevant to defendant's credibility at trial. *See Castaneda,* ___ N.C. App. at ___, 715 S.E.2d at 295 (holding detective's interrogation statements which jury could understand to be interrogation techniques, and which gave context to defendant's relevant responses, were relevant and did not constitute improper comment on defendant's veracity). Accordingly, the trial court did not err in overruling the objection.

No error.

Judges STEELMAN and ROBERT N. HUNTER, JR. concur.